# IN RE: NATURAL GAS ROYALTIES QUI TAM LITIGATION

Lead Case No. 15-8054
No. 15-8058
15-8059
15-8060
15-8062
15-8063
15-8066
15-8067
15-8068
15-8070
15-8071
15-8074
15-8075
15-8076
15-8077
15-8079
15-8080
15-8081
15-8082
15-8084

■

United States Court of Appeals, Tenth Circuit.

January 4, 2017

■

Martin J. Siegel, Law Offices of Martin J. Siegel, P.C., Houston, Texas (Michael S. Porter, The Law Firm of Michael S. Porter, Wheat Ridge, Colorado, and Roger A. Jatko, Grynberg Petroleum Company, Denver, Colorado, with him on the briefs), appearing for Appellant.

Michael L. Beatty, Beatty & Wozniak, P.C., Denver, Colorado (Rebecca H. Noecker, Beatty & Wozniak, P.C., Denver, Colorado, and Thomas F. Reese, Appellees' Liaison Counsel, Williams, Porter, Day & Neville, P.C., Casper, Wyoming,

with him on the brief), appearing for Appellees.

Before MATHESON, McHUGH, and MORITZ, Circuit Judges.

MATHESON, Circuit Judge.

This is the second appeal in a *qui tam* case lasting over 20 years and initially involving more than 300 natural gas industry defendants. The number of defendants has shrunk significantly, and the issues on this appeal present narrow questions. Specifically, Relator and Appellant Jack J. Grynberg appeals two district court orders awarding attorney fees.

First, Mr. Grynberg challenges an award of attorney fees under the False Claims Act ("FCA") to seven defendant groups: Transwestern, KN, SourceGas, El Paso, Snyder, Agave, and Panhandle (collectively, the "FCA Appellees"). The fees concern the district court proceedings. Second, Mr. Grynberg challenges an award of attorney fees relating to the first appeal to 13 defendant groups: the seven FCA Appellees plus Apache, CenterPoint, Columbia, ConocoPhillips, Enogex and OG&E, and TransMontaigne (collectively, the "Appellate–Fee Appellees").[1] Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the award of attorney fees under the FCA, and reverse the award of appellate-related attorney fees.

## I. BACKGROUND

We focus on the legal and procedural background pertinent to the current appeal. The following provides an overview of the FCA, Mr. Grynberg's complaint in his original action ("*Grynberg I*"), his complaints in the pending action ("*Grynberg II*"), and additional procedural history leading to this appeal.

### A. *The FCA*

The FCA imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).[2] The FCA's *qui tam* provisions authorize a private individual—also known as a "relator"—to bring a civil action to enforce its provisions on behalf of the government and to share in any resulting recovery. *Id.* § 3730(b)(1), (d). A relator is jurisdictionally barred from bringing an FCA *qui tam* action "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed," unless the relator is "an original source" of the information forming the allegations. *Id.* § 3730(e)(4)(A); *In re Nat. Gas Royalties*, 562 F.3d 1032, 1038–39 (10th Cir. 2009) (explaining the § 3730(e)(4)(A) requirements are jurisdictional).

### B. *Grynberg I*

In 1995, Mr. Grynberg filed an action in federal district court for the District of

---

1. Mr. Grynberg appealed the attorney fee awards only as to certain defendants, some of whom have since been voluntarily dismissed pending this appeal. At our request, Appellees submitted a document listing the parties still remaining on appeal. *See* Doc. No. 10404576.

2. When Mr. Grynberg filed his complaints, the FCA used different language in this provision, imposing liability on any person who "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the [federal] Government." Pub. L. 99–562 § 2(7) (1986) (codified as amended at 31 U.S.C. § 3729(a)(7)).

Columbia alleging 70 companies in the natural gas industry violated the FCA. *United States ex rel. Grynberg v. Alaska Pipeline Co.* ("*Grynberg I*"), No. Civ. 95–725 (TFH), 1997 WL 33763820, at *1 (D.D.C. 1997). Specifically, he accused the defendants of using 10 techniques that under-measured the gas they extracted from federal and Indian lands under lease agreements. *Id.* According to Mr. Grynberg, the companies' mismeasurement of the gas caused them to underpay royalties owing to the federal government, which in turn led them to submit false royalty statements to the federal government in violation of the FCA. *Id.*

Sixty of the defendants filed motions to dismiss. *Id.* The district court granted their motions. It first held the defendants were improperly joined under Federal Rule of Civil Procedure 20, and suggested Mr. Grynberg might seek to consolidate any future complaints into a Multidistrict Litigation ("MDL"). *Id.* at *2.

The district court also held that Mr. Grynberg's complaint failed to satisfy the particularized pleading requirement of Rule 9(b). *Id.* at *4–5. It described the complaint as a "shotgun" pleading that "fir[ed] out more than ten accusations at seventy defendants, hoping that some accusations stick on some defendants." *Id.* at *4. The court criticized Mr. Grynberg's pleading factual allegations on "information and belief," "because such tactics are generally employed to mask fishing expeditions." *Id.* The court described Mr. Grynberg's overall approach as "an attempt . . . to shift his investigatory burden onto defendants." *Id.*

Apart from those overarching concerns, the district court identified two specific deficiencies in the complaint. First, Mr. Grynberg had "not identif[ied] the time or place where each defendant engaged in these practices." *Id.* Second, Mr. Grynberg

had not specifically identified which defendant was responsible for which mismeasurement technique, or which defendant had submitted fraudulent statements to the federal government. *Id.* Instead, "[a]t most, he generally allege[d] that at least one of these sixty defendants committed at least one of these ten mismeasurement practices at some time and in some place, and that at least one defendant submitted fraudulent statements based on these mismeasurements." *Id.*

## C. *Grynberg II*

Three months after *Grynberg I*'s dismissal, Mr. Grynberg began filing 73 separate lawsuits against more than 300 companies in the natural gas industry. The 73 complaints, which closely resemble one another, form the basis of the current case. Taking *Grynberg I*'s suggestion, Mr. Grynberg moved to consolidate the cases as an MDL, and they were eventually consolidated in federal district court for the District of Wyoming.

### 1. The Complaints

*Grynberg II* rested on the same core allegations as *Grynberg I*. Mr. Grynberg again sued companies in the natural gas industry. He alleged they were responsible for mismeasuring gas extracted from their leases on federal or Indian land and for underreporting, or causing others to underreport, their royalty payments to the federal government in violation of the FCA. The *Grynberg II* complaints differed from the *Grynberg I* complaints in four significant ways.

First, Mr. Grynberg broadened his allegations. Instead of suing 70 defendants, he sued over 300. And instead of alleging 10 mismeasurement techniques, he alleged over 20.

Second, following *Grynberg I*'s suggestion to allege fewer facts "on information and belief," Mr. Grynberg alleged his knowledge of the fraud stemmed from his experience as an engineer and gas producer, his conversations with defendants' representatives, and his knowledge that gas measurers "such as Defendants routinely employ the same basic techniques for measuring gas." *See* App., Vol. 2 at 295 ¶ 30.

Third, Mr. Grynberg attempted to address the *Grynberg I* concern that he had not previously specified which defendants engaged in which mismeasurement techniques. In *Grynberg II*, he alleged each of the over 300 defendants had engaged in each of more than 20 mismeasuring techniques.[3] He also alleged that those techniques "do not necessarily encompass all of the mismeasurement and wrongful analysis practices" and that he would "supplement the list" as he confirmed the practices. App., Vol. 2 at 284 ¶ 10.

Finally, particularizing his allegations further, Mr. Grynberg attached to each complaint an Exhibit B, which was intended to show the particular lease on which each defendant had mismeasured gas and thereby underreported or caused to be underreported the amount of royalties owed. The Exhibit Bs require further explanation.

Between the dismissal in *Grynberg I* and filing the complaints in *Grynberg II*, Mr. Grynberg served Freedom of Information Act ("FOIA") requests with the Minerals Management Service ("MMS"), a federal agency that managed natural gas and other natural resources, seeking "a list, by lease (federal and Native American) of pipeline companies as purchasers of natural gas" for 1986 and 1987. *In re Nat. Gas Royalties Qui Tam Litig.*, No. 99–MD–1293–WFD, 2011 WL 12854134, at *5 ¶ 19 (D. Wyo. July 22, 2011). In 1997, the MMS responded with two discs of data.

The MMS data contained the following key pieces of information for each natural gas well: (1) a lease number where the natural gas was extracted from federal or Indian land; (2) the number of the "payor"—the entity responsible for submitting the royalty statement and payment to the federal government for the gas extracted from that lease; and (3) the name and number of the "buyer"—the entity that had purchased the gas extracted from the lease. *See* App., Vol. 50 at 12226.[4]

Mr. Grynberg created each Exhibit B from that MMS data. Each Exhibit B was structured the same way: the first column listed the payor numbers; the second column listed the federal lease serial numbers; and the final column listed the name(s) of the buyer(s). *See, e.g.*, App., Vol. 2 at 425. The buyers on the Exhibit Bs were the named defendants in the com-

---

3. The complaint against KN and the entities that became SourceGas is illustrative. In it, Mr. Grynberg alleged: "By engaging *in at least the Mismeasurement Techniques identified in paragraphs 32–57 above*, Defendants have knowingly made, used, or caused to be made or used false records or statements to convert, conceal, avoid, or decrease an obligation to pay or transmit money for payment of royalties to the United States Government." App., Vol. 2 at 399–400 ¶ 58 (emphasis added).

4. As the district court explained, Mr. Grynberg did not produce the original MMS data during discovery, claiming to have "lost" it during a move. *In re Nat. Gas Royalties Qui Tam Litig.*, 2011 WL 12854134, at *6 ¶ 24. The defendants then served their own FOIA requests seeking the same data the MMS had given Mr. Grynberg in 1997. *Id.* ¶ 25. The MMS data listed both the buyer number and the payor number for each lease. *Id.* Mr. Grynberg does not dispute on appeal that the defendants received the same MMS data he had received.

plaints. Although Mr. Grynberg included the name of the buyer(s) on each Exhibit B, he omitted the buyer number(s), which had been in the MMS data. *See* App., Vol. 4 at 984 (Exhibit B); App., Vol. 50 at 12226 (MMS data). As such, the name of the buyer (the defendant) was juxtaposed with the payor numbers and the lease numbers, *see, e.g.*, App. Vol. 4 at 984, leaving the impression that the defendant was not only the buyer, but also the payor of royalties on the leases listed in the Exhibit Bs. Each Exhibit B therefore seemed to support Mr. Grynberg's allegation that "Exhibit B identifies only those Royalty Properties on which Defendants have been the direct payors of royalties to the United States Government." App., Vol. 2 at 294.

In his complaints, Mr. Grynberg referred to the Exhibit Bs to show where the defendants were allegedly mismeasuring gas. He alleged that "Defendants or their agents have measured the volume and analyzed the heating content of natural gas produced from at least the Royalty Properties specified in Exhibit B" and that such mismeasurement occurred "from at least 1985 to the present [1997]." App., Vol. 2 at 293 ¶ 26.

The Exhibit Bs seemed to address the key deficiencies identified in *Grynberg I* by describing the place and circumstances of the alleged fraud. But, as explained below, the Exhibit Bs were inaccurate.

## 2. Rule 9(b) Motions

The inaccuracy of the Exhibit Bs did not surface until long after the complaints were filed and after the government conducted a time-consuming investigation. Without yet knowing the Exhibit Bs were inaccurate, the district court denied motions to dismiss for lack of particularity under Rule 9(b), which the court read as requiring a complaint to state the "time, place and contents of the false representa-

tion, [and] the identity of the party making the false statements." App., Vol. 7 at 1682 (quoting *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997)). In denying the motions, the court assumed the Exhibit Bs accurately showed on which leases the defendants were the "direct payors" of royalties to the federal government. *Id.* at 1684 n.5.

## 3. Original Source Litigation

After surviving the motions to dismiss, Mr. Grynberg faced another hurdle: the defendants' motions for summary judgment, which argued the complaints were based on publicly disclosed information and Mr. Grynberg was not an "original source" of the information. *See In re Nat. Gas Royalties*, 562 F.3d at 1038. As noted earlier, FCA *qui tam* claims are jurisdictionally barred if they are based on information that is publicly disclosed and the relator was not an "original source" of the information. 31 U.S.C. § 3730(e)(4)(A). Under the direction of a special master, the parties conducted limited jurisdictional discovery on that question. *See In re Nat. Gas Royalties*, 562 F.3d at 1038. Following discovery, the special master recommended to the district court that 40 of the 73 cases be dismissed for lack of jurisdiction. *Id.*

The district court adopted in part the special master's recommendation, but went further by holding that all 73 cases were jurisdictionally barred under § 3730(e)(4) because Mr. Grynberg was not an original source of the information alleged in his complaint. On appeal, we affirmed. *Id.*

## 4. Attorney Fee Awards

Following the dismissal of the claims and our decision in the first appeal, the district court entered two orders awarding attorney fees. The first awarded attorney fees under the FCA's fee-shifting provi-

sion, 31 U.S.C. § 3730(d)(4). *See In re Nat. Gas Royalties Qui Tam Litig.*, 2011 WL 12854134, at *10–13. The second order awarded attorney fees relating to the first appeal on the original-source question. Between the two orders, the court granted 35 defendant groups attorney fees totaling nearly $17 million. As to the remaining defendants in this appeal, around $5.5 million of attorney fees was awarded to the FCA Appellees for district court proceedings, and around $1 million of attorney fees was awarded to the Appellate–Fee Appellees for the first appeal.

We discuss the district court's reasons to award fees in more detail below.

## II. DISCUSSSION

Mr. Grynberg presents two issues on appeal. First, he argues the district court abused its discretion when it awarded attorney fees under the FCA relating to the district court proceedings. We hold the district court did not abuse its discretion and affirm. Second, Mr. Grynberg argues the district court did not have authority to award appellate-related attorney fees. We agree and reverse. Mr. Grynberg challenges only whether these fees should have been awarded and does not challenge whether the amounts are reasonable.

### A. *Attorney Fees for District Court Proceedings*

### 1. Standard of Review

■■■ We review the district court's decision to award attorney fees for an abuse of discretion. *United States ex rel. Grynberg v. Praxair, Inc.* ("*Praxair I*"), 389 F.3d 1038, 1055 (10th Cir. 2004). "Under the abuse of discretion standard, the deci-

sion of a trial court will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* at 1058 (quotations omitted). The abuse of discretion standard requires reviewing the district court's legal conclusions de novo and its factual findings for clear error. *See Lorillard Tobacco Co. v. Engida*, 611 F.3d 1209, 1213 (10th Cir. 2010) (applying the abuse of discretion standard when reviewing an award of attorney fees under the Lanham Act).

### 2. Legal Standard

The FCA's fee-shifting provision provides:

> If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and *the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.*

31 U.S.C. § 3730(d)(4) (emphasis added).

We focus on the phrase "clearly frivolous," which is the ground for our decision here.[5] The Supreme Court provided guidance on frivolousness in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). In *Christiansburg*, the Court addressed "what standard should inform a district court's discretion in deciding whether to award attorney's fees to a successful *defendant* in a Title VII action." *Id.* at 417, 98 S.Ct. 694. The Court said "[t]o the extent that abstract words can deal with concrete cases,"

---

5. We do not opine on when a claim is "clearly vexatious" or "brought primarily for purposes of harassment" under § 3730(d)(4)—or how those types of claims may differ or overlap with "clearly frivolous" claims. Those grounds for fee awards are not necessary to our disposition.

attorney fees may be awarded "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Id.* at 421, 98 S.Ct. 694. It cautioned that a "meritless" case is one that is "groundless or without foundation." *Id.* A case is not "meritless" simply because "the plaintiff has ultimately lost his case." *Id.*

 The Court concluded by restating its holding as follows: "Hence, a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Id.* at 422, 98 S.Ct. 694. In *Praxair I*, we held that *Christiansburg* should be followed to determine whether a plaintiff in an FCA case should receive attorney fees under § 3730(d)(4). 389 F.3d at 1058.

### 3. District Court's Decision

To award fees under § 3730(d)(4), the district court first made findings based on its review of the full procedural history of Mr. Grynberg's claims. *In re Nat. Gas Royalties Qui Tam Litig.*, 2011 WL 12854134, at *1–2. The court found that, to overcome the obstacles identified in *Grynberg I*, Mr. Grynberg had alleged each defendant engaged in each of 20 mismeasurement practices despite "knowing that he lacked the factual basis necessary to support such specific allegations." *Id.* at *2 ¶¶ 4–5. Indeed, "nothing" in Mr. Grynberg's disclosure to the government in the original-source litigation "showed that *any* [d]efendant engaged in *any* practice that resulted in the mismeasurement of gas." *Id.* at *3 ¶ 9. Mr. Grynberg's deposition testimony and interrogatory answers confirmed that he had lacked an evidentiary basis for that allegation. *Id.* at *4 ¶¶ 11–12.

The court also made several findings regarding Mr. Grynberg's Exhibit Bs, including that Mr. Grynberg relied on the exhibits to identify the particular leases where the defendants were the payors of royalties to the federal government and where they measured gas. *Id.* at *5 ¶¶ 21–22. But, according to the court, the Exhibit Bs "intentionally distort[ed]" the MMS data to suggest the buyer and payor were the same for the listed leases, even though the MMS data "often" showed the buyer and payor were not the same. *Id.* at *6–7 ¶¶ 25–26. "[T]he inescapable conclusion" was that the Exhibit Bs were "outright fabrication[s] designed to mislead [the court] into believing [Mr.] Grynberg's allegations were based on something more than complete speculation." *Id.* at *7 ¶ 26.

The court further found that Mr. Grynberg "proceed[ed] [with his claims] in spite of information from agency and government officials indicating his claims had no merit." *Id.* at *8 (capitalization altered). For instance, Mr. Grynberg initiated his lawsuits despite a warning from the Colorado Oil and Gas Conservation Commission—a group the district court described as having extensive public regulatory, private sector, and engineering experience—that his claims were "baseless and without merit." *Id.* at *8 ¶ 34. As another example, in the same month Mr. Grynberg started filing his *Grynberg II* complaints, an Assistant United States Attorney asked Mr. Grynberg to provide "specific factual references that provide evidence of mismeasurement for each defendant and company." *Id.* at *8 ¶ 35. Rather than responding with evidence, Mr. Grynberg responded that he needed discovery to establish whether the defendants mismeasured gas or caused gas to be mismeasured. *Id.* [6]

---

**6.** The district court's other findings that Mr. Grynberg intentionally lost documents rele-

vant to the defendants' investigation and sued some defendants despite knowing they had

Based on its findings, the district court applied § 3730 and *Christiansburg* and determined fees were appropriate for three reasons: (1) the claims were clearly frivolous; (2) Mr. Grynberg's position as an original source was clearly frivolous; and (3) his claims were clearly vexatious. *Id.* at *9–12 ¶¶ 1–11. The court therefore granted fees under § 3730(d)(4). It did not reach the issue of whether to award fees as sanctions under Rule 11 or its inherent powers. *See id.* at *13 ¶ 13. It noted, however, that its reasons for § 3730(d)(4) fees could also justify fees under Rule 11. *Id.*

The district court has articulated its rationale sufficiently for this court "to provide meaningful appellate review." *Praxair I*, 389 F.3d at 1059.

### 4. Analysis

■ Our review of the record has uncovered no reason to question the district court's findings regarding Mr. Grynberg's handling of the case. The court properly articulated and applied the legal standards under § 3730(d)(4) and *Christiansburg* after reviewing "the entire course of the litigation." *Praxair I*, 389 F.3d at 1059 (citing *Christiansburg*, 434 U.S. at 421–22, 98 S.Ct. 694). The court did not abuse its discretion in determining Mr. Grynberg's FCA claims were clearly frivolous.[7]

In reviewing the district court's decision to award fees, we focus on the specific claims against the FCA Appellees. We begin by discussing how the Exhibit Bs failed to provide an evidentiary foundation for Mr. Grynberg's claims and then turn to the other "evidence" that purportedly supported his claims.

#### a. The Exhibit Bs

*Grynberg I* identified two sets of allegations that were critical for Mr. Grynberg to plead an FCA claim with particularity: (1) allegations supporting the time and place of mismeasurement and (2) allegations identifying which defendant(s) mismeasured gas and which defendant(s) submitted false royalty statements. *See* 1997 WL 33763820, at *4. *Grynberg I* therefore provided Mr. Grynberg a roadmap of how to craft a complaint that satisfied Rule 9(b). In his *Grynberg II* complaints, Mr. Grynberg included new allegations that were missing from *Grynberg I*, and supported them mainly with the Exhibit Bs.

First, Mr. Grynberg relied on the Exhibit Bs to allege where the FCA Appellees were responsible for paying royalty statements to the federal government on the leases identified in the exhibits. App., Vol. 2 at 294 ¶ 27 (Complaint against KN and SourceGas) ("Exhibit B identifies only those Royalty Properties on which Defendants have been the *direct payors* of royalties to the United States Government but does not identify other properties as to which Defendants caused others to underpay royalties." (emphasis added)). Mr. Grynberg supported this allegation by omitting the buyer numbers in his Exhibit Bs, which juxtaposed the name of the buyer (also named as the defendant) alongside

---

never measured gas, *id.* at *7–8, are not necessary to our disposition.

**7.** Mr. Grynberg suggests the court could not determine his claims were clearly frivolous because he had not yet taken discovery. We disagree. The original-source discovery revealed what evidence Mr. Grynberg had when he filed his claims, which in turn revealed whether his claims were groundless or without foundation from the onset. As the district court said, "the underlying basis for [its] ruling [to dismiss the litigation on jurisdictional grounds] was that [Mr.] Grynberg *had no evidence* upon which to claim original source status and *to base his claims*." *In re Nat. Gas Royalties Qui Tam Litig.*, 2011 WL 12854134, at *11 ¶ 7 (emphasis added).

the payor numbers, which in turn implied the defendant was not only the buyer, but also the payor of royalties to the federal government on those leases.

Second, Mr. Grynberg relied on the Exhibit Bs to allege where the FCA Appellees were responsible for mismeasuring gas on the leases identified in the exhibits. *See, e.g.*, App., Vol. 2 at 293 ¶ 26 (Complaint against KN and SourceGas) ("Defendants or their agents have measured the volume and analyzed the heating content of natural gas produced from at least the Royalty Properties specified in Exhibit B.").

The Exhibit Bs showed the defendants listed as buyers of gas. Alleging the buyer-defendants were also the payors of royalties and measurers of gas on those federal or Indian leases addressed *Grynberg I*'s concern that Mr. Grynberg had not identified which defendants were responsible for submitting—or causing others to submit—false royalty statements to the federal government. Such an allegation was not only necessary to ensure the complaints survived Rule 9(b), but also to ensure Mr. Grynberg could state an FCA claim—which requires that the defendant made a false claim to the federal government (i.e., as the payor), or caused others to make a false statement (i.e., as the measurer). *See* Pub. L. 99–562.

Mr. Grynberg therefore created the Exhibit Bs to overcome the deficiencies of his *Grynberg I* complaints. Even though the exhibits appeared to do so on their face, in fact they did not.

Recall that in his *Grynberg II* complaints, Mr. Grynberg sued buyers of natural gas. As explained above, by omitting from the exhibits the buyer numbers, which were part of the MMS data, and by listing the buyer names next to the payor numbers, the exhibits appeared to represent that the buyers were also the payors of royalties to the federal government. Mr. Grynberg also alleged that the defendants were responsible for paying royalties to the federal government and for mismeasuring gas on federal or Indian leases, and the alleged mismeasurements caused them to misreport, or caused others to misreport, their royalty obligations to the federal government. But, after the parties engaged in discovery and the government investigated, it became clear that a buyer on any given lease was not necessarily a payor, who was in turn not necessarily a measurer. Indeed, the MMS data, on which Mr. Grynberg based the Exhibit Bs, did not even list the names of the payors or measurers.

As Mr. Grynberg's counsel conceded at oral argument, the Exhibit Bs failed to reflect that the buyer was not necessarily the payor or the measurer on any given lease. Oral Arg. at 8:45–10:14. Indeed, Mr. Grynberg does not dispute the district court's finding that the buyer and payor "often" were not the same on any given lease. *See In re Nat. Gas Royalties Qui Tam Litig.*, 2011 WL 12854134, at *6–7 ¶¶ 25–26.

The following example comparing the MMS data with an Exhibit B further supports that finding.[8] The MMS data looked like this:

---

8. This was the only MMS data the Appellees cited in their brief.

| PAYOR | PFX | SER | SFX | R-S | P-C | START | END | BUYER | NAME |
|---|---|---|---|---|---|---|---|---|---|
| 50405 | 049 | 014104 | A | 001 | 04 | 198701 | 199205 | 17350 | COLUMBIA GAS DEVELOPMENT CORP. |
| 50405 | 049 | 018048 | 0 | 001 | 04 | 198701 | 199205 | 17350 | COLUMBIA GAS DEVELOPMENT CORP. |
| 41350 | 054 | 002240 | 0 | 001 | 04 | 198109 | 198909 | 17350 | COLUMBIA GAS DEVELOPMENT CORP. |
| 41350 | 054 | 002240 | 0 | 002 | 04 | 198109 | 198909 | 17350 | COLUMBIA GAS DEVELOPMENT CORP. |
| 41350 | 054 | 002241 | 0 | 001 | 04 | 198109 | 198909 | 17350 | COLUMBIA GAS DEVELOPMENT CORP. |
| 41350 | 054 | 002241 | 0 | 003 | 04 | 198311 | 198909 | 17350 | COLUMBIA GAS DEVELOPMENT CORP. |
| 22201 | 054 | 002558 | 0 | 001 | 04 | 198109 | 199006 | 17350 | COLUMBIA GAS DEVELOPMENT CORP. |
| 22201 | 054 | 002560 | 0 | 001 | 03 | 198109 | 999999 | 17350 | COLUMBIA GAS DEVELOPMENT CORP. |
| 22201 | 054 | 002560 | 0 | 001 | 04 | 198109 | 999999 | 17350 | COLUMBIA GAS DEVELOPMENT CORP. |
| 22201 | 054 | 002576 | 0 | 001 | 04 | 198109 | 199007 | 17350 | COLUMBIA GAS DEVELOPMENT CORP. |
| 22201 | 054 | 003285 | 0 | 001 | 04 | 198109 | 198908 | 17350 | COLUMBIA GAS DEVELOPMENT CORP. |
| 38140 | 054 | 003416 | 0 | 002 | 04 | 198109 | 999999 | 17350 | COLUMBIA GAS DEVELOPMENT CORP. |
| 38140 | 054 | 003587 | 0 | 001 | 04 | 198109 | 999999 | 17350 | COLUMBIA GAS DEVELOPMENT CORP. |

SELLING ARRANGEMENTS AS OF 01/1987
05/06/97

COUNT FOR 17350: 13

App., Vol. 50 at 12226.[9] The Exhibit B in the complaint against the same company looked like this:

## EXHIBIT B

| PAYOR NUMBER | FEDERAL LEASE SERIAL NUMBERS | | | BUYER NAME |
|---|---|---|---|---|
| | PFX | SER | SFX | |
| 50405 | 049 | 014104 | A | COLUMBIA GAS DEVELOPMENT |
| 50405 | 049 | 018048 | 0 | COLUMBIA GAS DEVELOPMENT |
| 41350 | 054 | 002240 | 0 | COLUMBIA GAS DEVELOPMENT |
| 41350 | 054 | 002240 | 0 | COLUMBIA GAS DEVELOPMENT |
| 41350 | 054 | 002241 | 0 | COLUMBIA GAS DEVELOPMENT |
| 41350 | 054 | 002241 | 0 | COLUMBIA GAS DEVELOPMENT |
| 22201 | 054 | 002558 | 0 | COLUMBIA GAS DEVELOPMENT |
| 22201 | 054 | 002560 | 0 | COLUMBIA GAS DEVELOPMENT |
| 22201 | 054 | 002560 | 0 | COLUMBIA GAS DEVELOPMENT |
| 22201 | 054 | 002576 | 0 | COLUMBIA GAS DEVELOPMENT |
| 22201 | 054 | 003285 | 0 | COLUMBIA GAS DEVELOPMENT |
| 38140 | 054 | 003416 | 0 | COLUMBIA GAS DEVELOPMENT |
| 38140 | 054 | 003587 | 0 | COLUMBIA GAS DEVELOPMENT |

App., Vol. 4 at 984.

The MMS data show that the buyer number for a given entity is always the same. But the payor number is not always the same, showing there were different payors on the leases from which the buyer purchased gas. Moreover, the payor number is not the same as the buyer number—showing they were "often" different entities.

Had Mr. Grynberg included the buyer number on the Exhibit Bs, it would have been apparent sooner that the buyers were not necessarily also the payors of royalties on the identified leases, as Mr. Grynberg alleged. Only after the district court, rely-

ing in part on the Exhibit Bs, denied Rule 9(b) motions; after "massive and complex" discovery and an appeal to our court on the original source question, see App., Vol. 42 at 10249; and "[a]fter a thorough and time consuming" investigation by the government, see App., Vol. 41 at 9997, did it become clear the Exhibit Bs did not support Mr. Grynberg's claims.

In sum, the Exhibit Bs were fundamentally flawed and provided no evidentiary foundation for Mr. Grynberg's claims. In the words of Mr. Grynberg's counsel, "Exhibit B is wrong." Oral Arg. at 12:05–07. The record amply supports the district court's holding that his claims against the FCA Appellees were clearly frivolous.

9. The yellow highlighting appears on the document submitted in the appendix and was not added by the court.

### b. *Other Purported Support*

Instead of defending the accuracy of his Exhibit Bs, Mr. Grynberg argues they were not essential to his claims against the FCA Appellees. We are not convinced. Mr. Grynberg attached the Exhibit Bs to each complaint against the FCA Appellees, and the district court relied on the Exhibit Bs to deny the defendants' motions to dismiss.[10] Apart from the flaws with the Exhibit Bs, Mr. Grynberg fails to identify other evidence that would have provided an evidentiary foundation for his claims.

First, Mr. Grynberg points to his business dealings with the defendants and his personal investigation into their mismeasurement practices, which he argues revealed "at least some evidence" to support his claims against the FCA Appellees in particular. Aplt. Br. at 17–25, 31. In support, Mr. Grynberg relies heavily on the special master's finding in the original-source litigation that Mr. Grynberg had knowledge linking KN and Transwestern to "some of the mismeasurement practices forming the basis for his Complaints." *Id.* at 10 (citing App., Vol. 28 at 6427).[11]

The problem with this argument is that the special master's general finding did not support Mr. Grynberg's specific allegations in his *Grynberg II* complaints that Transwestern and KN engaged in mismeasurement techniques as to the specific federal or Indian leases listed there. The passages where the special master discussed its finding regarding Transwestern and KN did not mention the leases where this conduct allegedly occurred. *See, e.g.,* App., Vol. 28 at 6424–28. And Mr. Grynberg has not directed us to any such finding in the special master's report and recommendation.[12]

Before the district court and on this appeal, Mr. Grynberg has not identified factual support that specifically links the FCA Appellees, including Transwestern and KN, to mismeasurement practices on a specific federal or Indian lease listed in his complaints. *See* Aplt. Br. at 17–20 (asserting Mr. Grynberg's purported knowledge of Transwestern and KN's mismeasurement practices but not claiming he observed any of those mismeasurement practices on any leases listed in the complaints). In other words, if we set aside the Exhibit Bs and rely on Mr. Grynberg's purported other evidence to support his claims, Mr. Grynberg still has presented no evidence to support specifically where Transwestern and KN engaged in mismeasurement techniques.

In sum, neither the special master's finding about "some of the mismeasurement practices" nor evidence of Mr. Grynberg's personal investigation into "some" of the mismeasurement practices of the

---

10. *See, e.g.,* App., Vol. 2 at 415 (Exhibit B in KN and SourceGas complaint); App., Vol. 2 at 553 (Exhibit B in El Paso complaint); App., Vol. 2 at 488 (Exhibit B in Transwestern complaint); App., Vol. 3 at 731 (Exhibit B in Panhandle complaint); App., Vol. 4 at 1114 (Exhibit B in Agave complaint); App., Vol. 5 at 1381 (Exhibit B in Snyder complaint).

11. To support the strength of his evidence against the FCA Appellees, including Transwestern and KN, Mr. Grynberg cites an affidavit he submitted in district court in opposition to the motion for attorney fees. *See* Aplt. Br. at 17–18 (citing App., Vol. 46 at 11058–59

and Vol. 47 at 11479). Perhaps obviously, Mr. Grynberg's assertions in his affidavits are not sufficient to provide evidentiary foundation for his claims. If we could rely on Mr. Grynberg's word alone, we would not be here today.

12. In his report and recommendation, the special master referred to the "Nitchie Gulch, Blue Gravel, and Pecos Slope (Abo) Fields," where gas was purchased by "Questar, KN, and Transwestern[,] respectively." App., Vol. 28 at 6403. But Mr. Grynberg does not reference those fields in his complaints against KN or Transwestern.

FCA Appellees, persuades us that the district court "made a clear error of judgment or exceeded the bounds of permissible choice" in determining Mr. Grynberg's claims were clearly frivolous. *Praxair I*, 389 F.3d at 1058 (quotations omitted).

Second, Mr. Grynberg points to his knowledge of widespread mismeasurement in the natural gas industry to show his claims against the FCA Appellees were not clearly frivolous. But, again, he has not identified factual support for the particularized allegations that he made in the complaints. In other words, knowledge of widespread mismeasurement would not support his allegations that each defendant engaged in the 20 or so particular mismeasurement practices alleged in the complaints on the particular leases in the Exhibit Bs. And Mr. Grynberg admitted in his deposition that he lacked an evidentiary foundation for such particular allegations.[13] Those admissions gave the district court another firm basis to hold the claims were clearly frivolous. *See Prochaska v. Marcoux*, 632 F.2d 848, 854 (10th Cir. 1980) (holding that a plaintiff's deposition testimony admitting a lack of evidence supported fees under the *Christiansburg* standard).

■ Third, Mr. Grynberg argues he had a "reasonable belief" in his claims. Aplt. Br. at 37. A claim may not be frivolous if a plaintiff has a reasonable belief that the legal theory will prevail. *See, e.g., Jane L. v. Bangerter*, 61 F.3d 1505, 1517 (10th Cir. 1995) (reversing a grant of attorney fees because the asserted legal *theories* were not frivolous). But that assumes the factual predicate for the claim is not itself frivolous. Mr. Grynberg fails to cite any case holding that a claim is not frivolous because the plaintiff had a "reasonable belief" that the factual allegations were true. Indeed, Mr. Grynberg's continued pleading of facts "on information and belief" was precisely what led *Grynberg I* to suspect Mr. Grynberg was on a discovery fishing expedition. *See Grynberg I*, 1997 WL 33763820, at *4.

More broadly, Mr. Grynberg's attempts to minimize the significance of the inaccurate Exhibit Bs by pointing to other supporting evidence does not explain why he raised his claims after government officials, and even his own lawyers, told him that his claims—including those against the FCA Appellees—lacked an evidentiary foundation. *See* App., Vol. 51 at 12385 (1994 letter from Mr. Grynberg's attorney stating "we still don't have a shred of real live evidence to support our claims" against Transwestern); *id.* at 12411 (1996 letter from the Colorado Oil and Gas Commission stating 13 experienced employees had investigated the claims and determined the lawsuit was "baseless and without merit").

\* \* \* \*

In *Christiansburg*, the Supreme Court observed: "Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." 434 U.S. at 422, 98 S.Ct. 694. In this case, just the opposite occurred. Mr. Grynberg convinced the district court that his com-

---

**13.** *See, e.g.,* App., Vol. 76 at 18602 (stating that he could not remember if El Paso measured gas on a particular basin); App., Vol. 78 at 18835 (stating that he did not know which mismeasurement practice El Paso engaged in or caused others to engage in); App., Vol. 88 at 21344 (stating that it was more likely Snyder's purchaser, not Snyder itself, that measured the gas); App., Vol. 87 at 21180–81 (stating he could not remember whether Agave pays federal royalties); App., Vol. 89 at 21687–88 (stating he did not know whether TransColorado measured gas); App., Vol. 85 at 20599–601 (stating he did not know whether the Panhandle defendants either mismeasured or caused others to mismeasure the gas).

plaints should survive a Rule 9(b) motion to dismiss because he pled mismeasurement and fraud with specificity and backed up his allegations with the detailed data from his Exhibit Bs.

This case demonstrates the importance of *Christiansburg* and *Praxair I*'s instruction "that the district court review the entire course of the litigation in making [the attorney fees] determination." *Praxair I*, 389 F.3d at 1059 (citing *Christiansburg*, 434 U.S. at 421–22, 98 S.Ct. 694). This is so here because the Exhibit Bs were not what they purported to be, and Mr. Grynberg did not otherwise have evidence to support the claims he seemingly had rehabilitated from *Grynberg I*. The claims were "groundless," "without foundation," and "unreasonable," and therefore under *Christiansburg*, *Praxair I*, and § 3730(d)(4), "clearly frivolous."

Without support from the inaccurate Exhibit Bs, his own personal dealings and investigation of the fraud, or any other supporting evidence, Mr. Grynberg's claims against the FCA Appellees lacked an evidentiary foundation. In the district court's words, the allegations *Grynberg I* deemed critical to the claims' success were based on nothing more than "complete speculation." *In re Nat. Gas Royalties Qui Tam Litig.*, 2011 WL 12854134, at *7 ¶ 26. The district court therefore did not abuse its discretion in awarding fees under § 3730(d)(4) based on the clear frivolousness of Mr. Grynberg's claims against the FCA Appellees. Because the clear frivolousness of his claims is a sufficient ground to affirm, we need not address whether the court abused its discretion in awarding fees either because Mr. Grynberg's original-source position was clearly frivolous or because his claims were clearly vexatious.

We affirm the district court's grant of attorney fees under § 3730(d)(4).

### B. *Attorney Fees for the First Appeal*

We next turn to whether the district court erred when it concluded it had authority to award attorney fees relating to the first appeal on the original-source question. We reverse.

### 1. Standard of Review

■ As before, we review a district court's award of attorney fees for abuse of discretion. *Crumpacker v. Kansas, Dep't of Human Resources*, 474 F.3d 747, 755 (10th Cir. 2007). Under this standard, we review a district court's determination of its authority to award such fees de novo. *Id.*

### 2. Legal Standard

■ In *Hoyt v. Robson Cos., Inc.*, we held that a district court lacked authority to award appellate-related fees to a prevailing party absent explicit statutory authorization. 11 F.3d 983, 985 (10th Cir. 1993). The party must first apply to us for appellate-related attorney fees. *Id.* The Appellate–Fee Appellees did not do so.

We created a narrow exception to that rule in *Crumpacker*, 474 F.3d 747. Although it is generally the circuit court that must award appellate-related fees, we said a district court could award attorney fees related to an interlocutory appeal to "parties who prevail on interlocutory review in this court, and who subsequently become prevailing parties under Title VII or another fee-shifting provision at the conclusion of merits proceedings." *Id.* at 756.

We addressed the scope of the *Crumpacker* exception in *Flitton v. Primary Residential Mortgage, Inc.*, 614 F.3d 1173 (10th Cir. 2010). In *Flitton*, we declined to extend *Crumpacker* beyond interlocutory appeals for two reasons. *Id.* at 1179–80. First, such an extension was "inconsistent with the narrow language used in that case." *Id.* at 1180. We stated that "[n]o-

where in *Crumpacker* did we state or suggest that its rule applies to cases other than those in which a party succeeds on interlocutory appeal and subsequently becomes a prevailing party." *Id.* Second, extending *Crumpacker* "would effectively strip this court of its discretion to award appeal-related fees," which was the "fundamental premise on which the *Hoyt* rule was based." *Id.*

### 3. District Court's Decision

The district court awarded appellate-related attorney fees based on the *Crumpacker* exception. It stated that the "basic logic" of the *Crumpacker* exception was that district courts have "implicit authority" to award appellate-related attorney fees if a party fulfills the requirements of an applicable fee-shifting statute only after an appeal. App., Vol. 61 at 14832.

According to the district court, that "basic logic" applied here. It held that there were two requirements to justify fees under § 3730(d)(4): (1) defendants are "prevailing parties" and (2) the claims were "clearly frivolous, clearly vexatious, or brought primarily for the purposes of harassment." *Id.* The court reasoned that defendants became "prevailing parties" only after we affirmed its dismissal of the cases. And the second requirement was not fulfilled until the court determined fees were appropriate under § 3730(d)(4)—a decision that came after our decision in the first appeal. Thus, according to the court, both requirements of the FCA's fee-shifting statute were not fulfilled until after the first appeal, rendering it " 'interlocutory' in nature." *Id.* at 14833. The court thus determined the first appeal fell within the *Crumpacker* exception and awarded fees related to that appeal.

### 4. Analysis

■ We reverse. Under *Hoyt*, the district court lacked authority to award ap-

pellate-related attorney fees because no statute explicitly authorized it to award them and the defendants did not request the fees from us. *Hoyt*, 11 F.3d at 985.

■ Nor does the *Crumpacker* exception apply. That exception is narrowly confined to appellate-related fees for (1) fees related to interlocutory appeals and (2) parties who "subsequently become prevailing parties." *Crumpacker*, 474 F.3d at 756. Neither condition was met here.

First, as Appellees' counsel "readily admit[ted]" at oral argument, the first appeal was not interlocutory. Oral Arg. at 29:44–48. Instead, the district court's initial order dismissing the claims for lack of subject matter jurisdiction was a final order disposing of all the claims in the case. *See Amazon, Inc. v. Dirt Camp, Inc.*, 273 F.3d 1271, 1275 (10th Cir. 2001) ("[W]here the dismissal finally disposes of the case so that it is not subject to further proceedings in federal court, the dismissal is final and appealable."). The court's entry of separate final judgments following that order reinforced that it was final.

Second, the defendants did not "subsequently" become prevailing parties after the appeal. They became prevailing parties when the district court entered judgments in their favor before the appeal. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604–05, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (holding that prevailing parties include those who get "enforceable judgments on the merits" because that judgment was a "judicially sanctioned change in the legal relationship of the parties"). Nor does it matter that the judgments were based on a lack of jurisdiction under the FCA (because Mr. Grynberg was not an "original source" of publicly disclosed information) rather on the merits of the FCA claims. *See CRST Van Expedited,*

*Inc. v. EEOC,* —— U.S. ——, 136 S.Ct. 1642, 1651, 194 L.Ed.2d 707 (2016) ("The defendant may prevail [under the *Christiansburg* standard] even if the court's final judgment rejects the plaintiff's claim for a nonmerits reason."). Thus, the *Crumpacker* exception does not apply here and the district court lacked authority to award appellate-related fees.

Nor did the district court have authority to rely on the "basic logic" of *Crumpacker* to expand its exception to cases beyond interlocutory appeals. As we held in *Flitton,* the "narrow" exception in *Crumpacker* does not extend to cases "beyond interlocutory appeals." *Flitton,* 614 F.3d at 1179–80. Such an extension would "effectively strip this court of its discretion to award appeal-related fees" in all FCA cases. *Id.* at 1180. That discretion "was the fundamental premise on which the *Hoyt* rule was based" and our decision in *Crumpacker* "did not (and could not) eviscerate it." *Id.*

The district court therefore lacked authority to award appellate-related fees. We reverse.

### C. *Attorney Fees for this Appeal*

In their brief, Appellees request attorney fees and costs incurred in this appeal under § 3730(d)(4) and Rule 38 of the Federal Rules of Appellate Procedure. Although Appellees seem to equate the two grounds for fees, they apply in different circumstances. Under § 3730(d)(4), attorney fees are appropriate if the district court determines a claim was "clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." Under Rule 38, in contrast, attorney fees and costs are appropriate if a court of appeals determines "an appeal is frivolous." Fed. R. App. P. 38.

Even if a district court does not abuse its discretion in determining fees are appropriate under § 3730(d)(4), it does not necessarily follow that a court of appeals will find an appeal from that award frivolous. Such was the case here—where the district court did not abuse its discretion in awarding fees under § 3730(d)(4), but the appeal was not frivolous because, as we have held above, the district court lacked authority to award appellate-related fees.

Moreover, to the extent Appellees request fees under Rule 38, we deny their request for failure to file a separate motion. *See* Fed. R. App. P. 38 ("If a court of appeals determines that an appeal is frivolous, it may, *after a separately filed motion* or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee." (emphasis added)).

Accordingly, we deny Appellees' request for attorney fees and costs relating to this appeal.

### III. CONCLUSION

We (1) affirm the district court's grant of attorney fees under the FCA's fee-shifting provision, 31 U.S.C. § 3730(d)(4); (2) reverse the court's grant of attorney fees relating to the first appeal; (3) remand the case to the district court to enter orders and judgments consistent with this opinion; and (4) deny Appellees' request for attorney fees relating to this appeal.