**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 2, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MICHAEL R. LEATHERS,

     Plaintiff - Appellee,

v.

RONALD LEATHERS,

     Defendant - Appellant,

and

INTERNAL REVENUE SERVICE;
JAMES HOLDEN, Trustee for The Dirt
Cheap Mine Trust

     Defendants - Appellees,

and

CHESAPEAKE OPERATING, INC.;
OXY USA INC.; ANADARKO
PETROLEUM COMPANY, L.P.;
PIONEER NATURAL RESOURCES
U.S.A., INC.; MERIT ENERGY
COMPANY,

     Defendants.

------------------------------

JOE ALFRED IZEN, JR.,

     Attorney - Appellee.
_____

No. 15-3264

MICHAEL R. LEATHERS,

    Plaintiff - Appellee,

v.

RONALD LEATHERS; RONDA R.
OLSON; RUSTIN R. LEATHERS;
INTERNAL REVENUE SERVICE,

    Defendants - Appellees,

JAMES HOLDEN, Trustee for The, a/k/a
Dirt Cheap Mine Trust,

    Defendant - Appellant,

and

CHESAPEAKE OPERATING, INC.;
OXY USA INC.; ANADARKO
PETROLEUM COMPANY, L.P.;
PIONEER NATURAL RESOURCES
U.S.A., INC.,

    Defendants.

------------------------------

JOE ALFRED IZEN, JR.,

    Movant - Appellant.

No. 15-3280

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:08-CV-01213-EFM-GEB)**
_____


Gary D. Fielder, Arvada, Colorado, for Ronald Leathers.

2

Joe Alfred Izen, Jr., Bellaire, Texas, for James Holden, Trustee for the Dirt Cheap Mine Trust, and Joe Alfred Izen, Jr.

Randolph L. Hutter, Attorney, Tax Division (Caroline D. Ciraolo, Principal Deputy Assistant Attorney General, Francesca Ugolini, Attorney, Tax Division, and Barry R. Grissom, United States Attorney, appeared with him on the briefs), United States Department of Justice, Washington, D.C., for the Internal Revenue Service/United States.

Aaron L. Kite, Rebein Bangerter Rebein PA, Dodge City, Kansas, for Michael R. Leathers.

Derek S. Casey (Grant D. Klise with him on the brief), Triplett, Woolf & Garretson, LLC, Wichita, Kansas, for Ronda R. Olson and Rustin R. Leathers.

_____

Before **BACHARACH**, **PHILLIPS**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

## I. INTRODUCTION

This case involves a dispute over the ownership of mineral rights appurtenant to several tracts of land located in Haskell County, Kansas, as well as the royalties due on those mineral rights. Michael Leathers and his brother Ronald Leathers each inherited half of these mineral rights from their mother.[1] But an error in a quit claim deed subsequently executed between the brothers left it unclear whether Ronald's one-half interest in the mineral estate had been conveyed to Michael.

In January 2007, Michael filed a lawsuit seeking to quiet title to the disputed one-half interest and related royalties. As defendants, Michael named Ronald; Ronald's ex-wife, Theresa Leathers; James Holden, as Trustee for an entity called the Dirt Cheap

_____

[1] To avoid confusion among the parties with the surname "Leathers," we refer to them by their first names.

Mine Trust; various energy companies, as producers of natural gas from the mineral rights; and the United States, on behalf of the Internal Revenue Service ("IRS"), as a holder of tax liens on any property owned by Ronald.

In a series of orders spanning several years, the district court (1) reformed the quit claim deed to reflect that Ronald had reserved his one-half interest in the mineral estate; (2) awarded half of Ronald's one-half interest (i.e., a one-quarter interest) to Theresa, pursuant to Ronald and Theresa's divorce decree; and (3) held that Ronald owed approximately $1.5 million to the IRS and that the IRS's tax liens had first priority to any present and future royalties due to Ronald from his remaining one-quarter mineral interest.

Ronald filed a timely appeal (Case No. 15-3264), and Holden and Joe Alfred Izen, Jr., the attorney for the Dirt Cheap Mine Trust, filed a separate appeal (Case No. 15-3280). The appeals were briefed and argued separately, and they largely raise independent issues. Nonetheless, because both appeals arise from a common, complicated factual and procedural background, we consolidate them for disposition and consider both appeals in this Opinion. For the reasons set forth below, we affirm the district court's judgment on all grounds.

## II. BACKGROUND

### A. *Factual History*

#### 1. The Mineral Interests

Michael Leathers and Ronald Leathers are brothers, and Louise Leathers was their mother. Louise owned 2.5 sections of land in Haskell County, Kansas (the "Property"). In

4

1973, Michael, Ronald, and Louise signed a partnership agreement forming a general partnership called the Leathers Land Company. Louise transferred the surface estate of the Property to the partnership, but she reserved ownership of the appurtenant mineral estate. When Louise died in 1991, ownership of the mineral estate passed to Michael and Ronald in equal shares. Michael and Ronald also each became 50 percent owners of the Leathers Land Company.

In 1996, Michael invoked a mutual buy-out provision of the partnership agreement in order to purchase Ronald's 50 percent share of the Leathers Land Company's assets. This move led to a dispute between the brothers which ended in a state-court judgment ordering Ronald to convey his 50 percent interest in the surface estate of the Property to Michael. On May 11, 1998, Ronald signed a quit claim deed (the "Quit Claim Deed" or the "Deed") which transferred all of Ronald's interest in the Property to Michael. Critical here, the Deed did not expressly reserve Ronald's 50 percent interest in the Property's mineral estate. The Deed was recorded in Haskell County.

In June 2000, Ronald's wife, Theresa Leathers, filed for divorce in Kansas state court. In connection with the divorce, Theresa filed a Notice of Lis Pendens with the Register of Deeds in Haskell County, specifically referencing the Property.[2]

While the divorce was pending, Michael began hearing from several energy companies about issues with the title to the mineral rights in the Property. In September

---

[2] A notice of "lis pendens" is "[a] notice, recorded in the chain of title to real property, required or permitted in some jurisdictions to warn all persons that certain property is the subject matter of litigation, and that any interests acquired during the pendency of the suit are subject to its outcome." *Lis pendens*, Black's Law Dictionary (10th ed. 2014).

2000, a representative from Chesapeake Energy Company ("Chesapeake") told Michael that the Deed had not reserved to Ronald any mineral rights appurtenant to the Property. The representative tried to contact Ronald as well, but Ronald did not respond.

In October 2001, Anadarko Petroleum Corporation ("Anadarko") contacted Michael about future royalty payments on production from a new well. A division order included in the correspondence stated that Ronald held "no interest" in the mineral rights appurtenant to the Property, that Michael owned 50 percent of the rights, and that another entity owned the other 50 percent. Anadarko asked Michael to make any necessary corrections to the division order before signing and returning it. Michael edited the division order to show that he and Ronald each owned 50 percent of the mineral rights, and he sent it to Anadarko along with a letter explaining that this reflected the accurate ownership of the mineral estate and also noting his belief that Theresa would receive half of Ronald's share in their pending divorce. Michael also sent a copy of the letter to Theresa's attorney.

In subsequent communications, Anadarko told Michael (1) that he would need to transfer 50 percent of the mineral rights to Ronald in order to fix the problem created by the Deed, (2) that Anadarko had sent a letter to Ronald informing him of the Deed's effect, and (3) that payment of one-half of future royalties would be held in a suspense account until the issue was resolved.

In January 2002, Michael began receiving, and depositing in his bank account, royalty payments from the new Anadarko well. That same month, Ronald stopped

6

receiving royalty payments from Chesapeake. Ronald called Chesapeake and was informed of the title problem.

In May 2002, Michael testified in Ronald and Theresa's divorce case regarding the ownership, and value, of the mineral interests in the Property. Despite the unresolved title problem, Michael testified that Ronald owned half of the mineral rights. On July 5, 2002, the divorce court entered a divorce decree which awarded Theresa a 25 percent interest in the mineral rights in the Property (i.e., half of Ronald's 50 percent interest). The divorce court did not reform the Deed to reflect a reservation of mineral rights to Ronald.

Confusion over ownership of the mineral estate and entitlement to royalty payments persisted for several more years. Theresa advised Ronald in 2003, and again in 2004, that she was not receiving royalty checks from Chesapeake, due to Chesapeake's concern about the title problem. In April 2004, Michael received his first royalty payment for production from another new Anadarko well, which he deposited in his bank account. In early November 2005, Ronald sent Michael a letter in which Ronald claimed he recently had discovered the problem with the Deed and believed Michael had been receiving royalty payments that should have been paid to him. Michael responded about a week later, noting that Ronald was informed of the Deed problem in October 2001 and that Theresa's attorney was informed later that year. Michael offered to help investigate any problems with Ronald's royalty payments if Ronald provided more information, and he agreed to execute a new quit claim deed conveying to Ronald and Theresa in equal shares the one-half mineral interest Ronald had inherited. Ronald did not respond to this offer.

7

In December 2006, Michael determined that Ronald and Theresa were not receiving royalty payments on production from several wells and came to believe he had received payments belonging to one or both of them.

### 2. The IRS Tax Liens

Ronald did not file tax returns during the years 1997 through 2005, but the IRS determined that he owed, and so assessed against him, federal income tax for those years. The IRS then filed several Notices of Federal Tax Liens in Haskell County, Kansas, thereby effectively encumbering the Property. In April 2005, and again in September 2006, the IRS filed a tax lien for tax years 1997 through 2002. In November 2007, the IRS completed and mailed to Ronald a tax assessment for the years 2003 through 2005. In February 2008, the IRS filed a tax lien for Ronald's tax liabilities from those years. All told, the IRS concluded that Ronald owed more than $900,000 in income tax, not including interest or penalties.

### 3. The Dirt Cheap Mine Trust

After receiving notice of the first tax liens, Ronald enlisted the services of James Holden to help Ronald protect his assets. Holden drafted and, on October 6, 2006, executed a "Contractual Trust Agreement" which created a trust called "The Dirt Cheap Mine" (the "Dirt Cheap Mine Trust" or the "Trust"), ostensibly to "provide a retirement vehicle for Ronald Roy Leathers." The agreement appointed Holden as Trustee for the

8

Dirt Cheap Mine Trust[3] and contemplated that Ronald would convey to the Trust "a certain chose in action" in exchange for 45/100 units of "Participation" in the Trust.

That same day, Ronald signed a notarized document entitled "Irrevocable Assignment of Chose(s) in Action" whereby he "convey[ed] all right, title and interests to [the mineral rights he had inherited] and 'chose(s) in action' flowing from said 'mineral rights'" to the Trust. The Trust allegedly was created to recover Ronald's portion of the mineral rights appurtenant to the Property and any royalties mistakenly paid to Michael. But Ronald and Holden both would later concede that the Trust was created to shield Ronald's assets from the IRS.

### 4. The Texas Reformation Action

On October 20, 2006, an attorney named Joe Alfred Izen, Jr., filed a lawsuit on behalf of Ronald and Holden in Texas state court against Michael; Michael's wife, Nancy Leathers; Anadarko; Pioneer Natural Resources, USA, Inc.; OXY USA Inc.; and Coastal Petroleum, Inc. The lawsuit sought to reform the Quit Claim Deed, to recover royalty payments that should have been paid to Ronald, and to recover damages from Michael. The Texas case was later dismissed for lack of subject matter jurisdiction because it was deemed an in rem action affecting the Property located in Kansas.

Meanwhile, on October 23, 2006, Holden signed a notarized document that appointed and retained Izen "to represent the financial interests of [the] Trust." In exchange for Izen's services, the document awarded Izen 45 of the remaining 55 units of

---

[3] For simplicity, we refer to James Holden by his last name only. But in all respects relevant to this case Holden is acting on behalf of the Dirt Cheap Mine Trust, in his capacity as Trustee.

Participation in the Trust. On October 27, 2006, Holden executed an "Attorney Consultation and Fee Contract" with Izen on behalf of the Trust, under which the Trust retained Izen for a contingent fee of 45 percent of any amount collected from Michael, Michael's wife Nancy, and Theresa. Ronald was not a party to either agreement.

### 5. The Oxy Interpleader Action

On February 26, 2007, one month after Michael initiated the present case (which is addressed below), OXY USA Inc. ("Oxy") filed an interpleader action in the United States District Court for the Southern District of Texas, naming Michael, Nancy, Ronald, Holden, and the IRS as defendants. Oxy was holding approximately $25,000 in suspended royalty payments owed on the disputed one-half mineral interest and sought the assistance of the court in determining who was entitled to the money.

Michael and Nancy disclaimed any interest in the royalty payments. That left the IRS, on the one hand, and Ronald and Holden, on the other, with competing claims to the money. The district court concluded, and the attorney for Ronald and Holden seemingly conceded, that Holden was a "fake trustee," that there was "no substance to the [Dirt Cheap Mine Trust]," and that the Trust was a "fake trust." Therefore, the district court concluded the IRS had the superior claim to the money.

Ronald and Holden appealed, and the United States Court of Appeals for the Fifth Circuit affirmed in an unpublished opinion. *See OXY USA Inc. v. Holden*, 306 F. App'x 69 (5th Cir. 2009) (per curiam) (unpublished). As relevant here, the Fifth Circuit stated that "[t]he parties conceded [in the district court] that Dirt Cheap Mine Trust was a fake

10

trust, and therefore Holden did not have an interest in the funds superior to Ronald and the IRS." *Id.* at 72.

### B. *Procedural History*

### 1. The Present Case, Generally

On January 5, 2007, Michael filed three separate actions in the Kansas state district court located in Haskell County (the "state court"), seeking to quiet title to the disputed one-half mineral interest and the suspended royalties, pursuant to Kansas Statutes Annotated § 60-1002. Michael named as defendants Ronald, Holden, Theresa, and the various energy companies with producing wells on the Property. The three actions eventually were consolidated.

Ronald and Holden initially were represented by local counsel, who filed answers, counterclaims, and crossclaims on their behalf. Then, in March 2007, Izen was admitted *pro hoc vice* to represent Ronald and Holden in the case.

In December 2007, Michael discovered the IRS had filed tax liens against Ronald and moved to amend his petition and to add the United States as a necessary party. His motions were granted, and on June 16, 2008, Michael filed an amended petition, naming the United States as a party potentially claiming an interest in the disputed mineral rights and royalties. The United States filed a notice of removal on July 16, 2008, and the case was removed to the United States District Court for the District of Kansas (the "district court").

Before and after the amended petition was filed and the case removed, the parties submitted various answers, counterclaims, and crossclaims. Because many of these separate actions are relevant to the issues on appeal, we summarize them briefly here.

### a. *Ronald and Holden*

In February 2007, Ronald and Holden filed an answer to Michael's original quiet title petitions in which they asserted affirmative defenses and brought counterclaims, crossclaims, and third-party actions. Among the defenses asserted were (1) *reformation*, asking that the Deed be reformed to reflect the parties' intention that Ronald would retain the one-half mineral interest he had inherited; and (2) *unjust enrichment*, stating that Michael paid nothing for the erroneously transferred mineral interest and was unjustly enriched by his retention of the interest and receipt of associated royalty payments.

They also asserted four causes of action as either a counterclaim or a crossclaim:

- *Restitution and/or Recovery of Legal Damages*—First, the response asserted a counterclaim against Michael and the energy companies for a decree of restitution ordering that any royalties attributable to the disputed one-half interest (whether disbursed or held in suspense) be paid to Holden (*not* Ronald), since Ronald allegedly assigned his interest to the Trust.

- *Breach of Fiduciary Duty and Imposition of Constructive Trust*—Second, the response asserted a counterclaim against Michael, alleging Michael owed Ronald a fiduciary duty under Kansas law and breached that duty in various ways.

- *Decree for Complete Accounting*—Third, the response asked for a decree directing all other parties, except Theresa, to prepare and file with the district court a complete accounting of all payments made, due, or received, which are attributable to the disputed one-half interest.

- *Declaratory Judgment or Equitable Decree*—Finally, as a crossclaim against Theresa, the response asserted Ronald and Holden are entitled to a decree finding that, to the extent they successfully recover the mineral interest, royalty money, or other damages, they should recover those damages free of any claim of

12

Theresa. Ronald and Holden asserted that, due to the Deed, Ronald did not own the mineral interest at the time of Theresa and Ronald's divorce. They therefore claimed the divorce court lacked authority to award Theresa a share of the mineral interest in the decree because it was not marital property.

Ronald and Holden summarized their requested relief in a list of 15 items, which included reformation of the Deed and an order declaring that the disputed one-half interest and related royalties are now owned by Holden, as Ronald's assignee. Neither Ronald nor Holden filed a response to Michael's amended petition.

### b. *Theresa*

In February 2007, Theresa filed answers to Michael's original petitions, requesting that the court enter a decree quieting title, assigning her a 25 percent interest in the mineral rights, and ordering the energy companies to pay her the corresponding portion of the suspended royalties. On July 30, 2008, Theresa filed in the state court an "Answer/Cross-claim/Counter-claim" to Michael's amended petition. Because the United States had removed the case already, this pleading was not transferred to the district court. Theresa then filed a notice of her pleading in the district court, with the pleading attached.

Theresa organized her counterclaim against Ronald and Holden, and crossclaim against Michael, under the same heading, generally asserting that (1) she is entitled to a judgment declaring her the owner of 25 percent of the mineral rights appurtenant to the Property, contrary to Michael's claim; (2) Ronald is barred by res judicata from asserting claims against her that conflict with the divorce decree; (3) Ronald and Holden's claims against her should be disallowed because they are meritless; (4) she should be awarded

13

fees associated with defending against Ronald and Holden's claims; (5) the court should order an accounting, similar to that requested by Ronald and Holden; and (6) the court should order that her interest in the mineral estate and royalties is free of any claim by the IRS.

### c. *The United States*

After removing the case to federal court, the United States filed its first answer to Michael's amended petition on August 18, 2008. On June 21, 2010, the government filed an amended answer in which it asserted a single crossclaim against Ronald. Specifically, the government brought a civil action under 26 U.S.C. § 7401 to reduce the outstanding tax assessments against Ronald to judgment. The government alleged that, as of May 1, 2010, Ronald owed approximately $1.4 million in income tax for the years 1997 through 2005, including interest, and it asked for a judgment against Ronald in that amount, plus future interest. Ronald and Holden answered the United States' crossclaim on July 9, 2010, asserting various affirmative defenses.

### 2. Bifurcation, and First Round of Dispositive Motions in the Quiet Title Phase

In November 2008, the district court granted the parties' joint motion for separate trials, ruling that the case should be bifurcated. The court determined that the quiet title issues, including Ronald and Holden's, and Theresa's, respective counterclaims and crossclaims, should be addressed in the first phase of the litigation. All other issues, including the accounting actions and tax matters, would be addressed in a second phase thereafter.

14

Between March and April of 2009, Theresa, Michael, and Ronald and Holden each filed motions for summary judgment regarding the first-phase issues and claims. On May 13, 2010, after the motions were fully briefed and heard, the district court issued a comprehensive order granting Theresa's motion, and granting in part and denying in part both Michael's, and Ronald and Holden's, motions ("May 2010 Order"). We now summarize the parties' arguments, and the district court's findings, with respect to the issues relevant to the present appeals.

a. *Reformation and Quiet Title*

Theresa moved for summary judgment, asking the court to grant Michael's request for quiet title. Specifically, Theresa argued the court should (1) reform the Deed to reflect the parties' original intention that Ronald would reserve his one-half mineral interest, and (2) enforce the divorce decree by awarding her half of Ronald's 50 percent mineral interest. Michael did not oppose Theresa's requested relief. Although Ronald and Holden also sought reformation of the Deed to reflect the parties' intent that Ronald retain his 50 percent interest in the mineral estate, they opposed on several grounds Theresa's claim to a one-quarter portion of the mineral rights.

The district court determined reformation was appropriate under Kansas law due to mutual mistake because both Michael and Ronald intended that Ronald would retain his one-half interest in the mineral estate when he conveyed his one-half interest in the surface estate to Michael by the Deed. The district court further concluded that the reformation related back to the date the Deed was executed—May 11, 1998—and took

15

effect from that date forward, binding all but good faith purchasers in any subsequent transactions.

The district court then quieted title to the mineral rights in the following shares: 50 percent to Michael, 25 percent to Ronald, and 25 percent to Theresa in accordance with the divorce decree. In doing so, the court rejected Ronald and Holden's various arguments opposing Theresa's claim. First, it disposed of their argument that the divorce court lacked authority to award Theresa an interest in the mineral rights because, per the mistake in the Deed, Ronald did not own the rights at the time of the divorce. The district court found, to the contrary, that Ronald owned the mineral rights at the time of the divorce because the reformation related back to the date the Deed was signed, which occurred before entry of the divorce decree.

Next, the court rebuffed several of Ronald and Holden's arguments premised on the notion that Theresa was attempting to reopen, modify, and/or set aside the divorce decree—e.g., arguments invoking a statute of limitations bar, the domestic relations exception to federal jurisdiction, and other jurisdictional limitations—because the court concluded Theresa was not attempting to do any of those things. Rather, Theresa was asking the court to enforce the divorce decree as written. And the district court determined the divorce court's judgment should be given preclusive effect because Ronald and Theresa had a fair opportunity to litigate their claims in the divorce proceeding. Thus, the district court concluded that, to the extent Ronald and Holden were attempting to relitigate the divorce court's award of half Ronald's mineral interest to Theresa, their claim was barred by res judicata and full-faith-and-credit principles.

16

b. *Unjust Enrichment / Constructive Trust*

Michael, and Ronald and Holden, filed cross motions for summary judgment on Ronald and Holden's claim for unjust enrichment and their request that the court impose a constructive trust on royalties which belonged to Ronald but were paid to Michael.[4] Michael argued the unjust enrichment claim failed as a matter of law because Ronald did not confer a benefit on him, the claim was barred by the doctrine of unclean hands, the claim was barred by the statute of limitations, and Ronald could not recover on the claim in any event because he had transferred his interest to the Dirt Cheap Mine Trust.

The district court determined that summary judgment was not warranted on the unjust enrichment claim because a reasonable jury could find (1) a benefit was conferred on Michael, (2) Michael had an appreciation or knowledge of that benefit beginning in December 2006, and (3) Michael retained or accepted that benefit when he deposited certain disputed royalty payments in his bank account. Turning to Michael's unclean hands defense, the court concluded a jury should decide, based on the evidence, whether Ronald acted with unclean hands. Next, the court determined the unjust enrichment claim was not barred by Kansas's three-year statute of limitations because the limitations period

---

[4] Ronald and Holden had claimed that the court should impose a constructive trust on these payments because Michael breached a fiduciary duty he owed to Ronald. But the court concluded Michael did not owe Ronald a fiduciary duty, and no party challenges that determination in either appeal. The district court explained, however, that because a constructive trust is an equitable remedy, as opposed to an independent claim, Ronald and Holden could request a constructive trust as a remedy for their unjust enrichment claim.

did not begin to run until Michael knew of the misapplied royalty payments, which a jury could find to be December 2006[5]—within the limitations period.[6]

### 3. Culmination of the Quiet-Title Phase

Following the May 2010 Order, the parties participated in a pretrial conference, and on July 12, 2011, the district court issued a pretrial order which, among other things, defined the scope of the remaining factual and legal issues in the quiet title stage. Around this time, the parties submitted various additional dispositive motions.

Theresa moved for summary judgment on her remaining claim of unjust enrichment against Michael. In late July 2011, Ronald and Holden filed a "First Amended Counter-claim and Cross-claim" in which they reasserted many of their prior claims addressed in the May 2010 Order and pleaded counterclaims for conversion and fraud-by-silence against Michael. They then moved for summary judgment on the conversion and fraud-by-silence claims. Michael filed a motion to dismiss or for summary judgment on those counterclaims.

On May 29, 2012, the district court issued an order addressing these and other motions ("May 2012 Order"). It denied Theresa's motion for summary judgment against Michael on her unjust enrichment claim "essentially for the same reasons as set out in the

---

[5] Although the court's order says January 2006, it is apparent, based on the court's findings with respect to the second element of unjust enrichment, that this is a typographical error.

[6] Ronald and Holden also moved for summary judgment on the validity of the Dirt Cheap Mine Trust, asking that the district court find it is a valid trust. The district court declined to rule on that issue at that time because not all parties had been given a chance to present arguments on it.

18

[May 2010 Order]" with respect to Ronald and Holden's unjust enrichment claim. The district court also denied Michael's motion to dismiss the conversion and fraud-by-silence counterclaims; however, it granted Michael's alternative request for summary judgment as to both. Thus, after the May 2012 Order, there remained two unresolved issues in the first phase of the litigation: (1) "Do the royalty payments received by Michael result in a constructive trust for Ronald and Theresa?" and (2) "Was Michael unjustly enriched?"

After the energy companies had submitted their royalty accountings, Michael filed another motion for summary judgment requesting that the district court limit his monetary exposure on the unjust enrichment claims. On August 28, 2013, the district court granted Michael's motion ("August 2013 Order"). The court found that the amount of money received by Michael which should have been paid to Ronald and Theresa was $32,665.96 and that this figure represented Michael's maximum liability on the unjust enrichment claims. Because Ronald and Theresa each were entitled to half of that amount, Michael's maximum liability on each claim was $16,332.98.

Theresa died at some point during the litigation, and the representative of her estate accepted an offer of judgment from Michael for $16,332.98. The district court entered judgment against Michael for this amount in December 2013. Although Ronald and Holden's parallel claim initially was set for an October 2014 bench trial, along with tax issues from the second stage of the case, the bench trial was postponed when the court learned that Ronald had filed for bankruptcy in Colorado. Thereafter, Holden accepted an offer of judgment from Michael for $16,332.98, and on September 2, 2015, the district

19

court approved a stipulated order of partial judgment resolving the unjust enrichment claim in favor of Holden and against Michael. The stipulated order declared that Holden held the unjust enrichment claim by virtue of Ronald's assignment of his choses in action to the Trust in 2006. The district court later noted that Ronald "has waived or is estopped from challenging Holden's settlement of the unjust enrichment claim with [Michael], based on Ronald's representation that Holden was his assignee on this claim." These judgments disposed of the unjust enrichment claims and brought the quiet title phase of the bifurcated proceedings to an end.

### 4. The Tax Phase

As noted above, after the United States removed this case to federal court, it filed a crossclaim against Ronald seeking to reduce Ronald's outstanding tax debt to judgment. Ronald and Holden filed an answer to the crossclaim in which they raised various affirmative defenses and sought attorney fees "they incurred in proving ownership of the mineral interests in question against which the United States purports to assert a lien."

On November 28, 2012, the United States moved for summary judgment on its crossclaim and for dismissal of Ronald and Holden's claim for attorney fees. The government submitted exhibits showing that Ronald failed to pay income taxes from 1997 to 2005 and that, as of September 21, 2012, he owed the IRS $1,561,117.06. Ronald and Holden, through Izen, opposed the motion on various grounds. They asserted that, even if the IRS had a valid claim to royalty payments from Ronald's mineral interest, Izen's contingent fee agreement with the Trust gave him a superpriority lien on any recovery by the Trust over and above any tax lien, pursuant to 26 U.S.C. § 6323(b)(8).

20

On May 3, 2013, the district court issued an order granting in part and denying in part the United States' motion ("May 2013 Order"). Based largely on deficiencies in Ronald and Holden's response, the district court concluded that the government's version of the facts was uncontroverted. The court then granted summary judgment for the United States on Ronald's tax debt for the years 1997 and 1999 through 2005, and reduced the assessments from those years to judgment. But it decided that a factual dispute precluded summary judgment as to tax year 1998.

The district court also concluded that all royalties found owing to Ronald would be subject to the IRS tax liens, but it did not finally determine the priority of those liens vis-à-vis other claims. The court rejected the government's contention that the "fake trust" findings made in the Oxy interpleader action collaterally estopped Ronald and Holden from arguing Ronald's assignment to the Trust gave the Trust a valid claim to the royalties. Specifically, the court concluded the finding of the Texas federal court—that Ronald and Holden had conceded the Trust was a "sham"—did not represent a final adjudication on the merits of the Trust's validity because the validity of the Trust was not actually litigated in that case. The court reserved the issue for trial, "express[ing] no opinion . . . on the validity of the trust or the purported assignment by Ronald." And the district court granted the government's summary judgment motion with respect to Izen's claim for attorney fees under 26 U.S.C. § 6323(b)(8), but it did so without prejudice to reassertion of the claim at a later time.

Next, in December 2013, the United States filed a motion for summary judgment seeking to foreclose its tax liens and establish their priority. Holden (apparently without

21

Ronald) filed a cross motion for partial summary judgment. On February 27, 2014, the district court issued an order granting in part and denying in part the United States' motion and denying Holden's ("February 2014 Order"). The court concluded that the tax lien for the years 1997 and 1999 through 2002, which the IRS first filed in April 2005, had first priority to the royalties from Ronald's share of the mineral interest, and that Holden had conceded as much. But the court determined there was a triable issue of fact as to the priority of the lien for the years 2003 through 2005. Because Ronald purportedly transferred his mineral interest and choses in action to the Trust in October 2006, and the IRS did not file a lien on the 2003–2005 taxes until 2008, the court explained that the lien for those years would not be valid against the Trust "unless [the United States] establishes that Ronald fraudulently transferred his interest to the trust."

Thus, the parties prepared and submitted briefing for a bench trial on the remaining issues in the case: (1) the United States' claim against Ronald for unpaid taxes from 1998; (2) the validity of the Dirt Cheap Mine Trust and/or Ronald's October 2006 transfer to it; and (3) Izen's renewed request for attorney's fees pursuant to 26 U.S.C. § 6323(b)(8). The district court held a bench trial on September 17, 2015 and issued its rulings in a written order on September 25, 2015 ("September 2015 Order").

First, the court held that the United States was entitled to judgment on its claim against Ronald for $192,205.24 in unpaid taxes from 1998. Second, the district court found that "Ronald's transfer of the chose-in-action involving his mineral rights to the trust (as well as the transfer of the mineral rights, to the extent he purported to transfer them) constituted a fraudulent transfer with respect to his tax debt to the IRS." The court

22

reasoned that the "circumstances surrounding the transfer and the deposition testimony of Ronald and Holden show that Ronald's intent in making the transfer was to hinder the IRS from collecting Ronald's tax debt." Indeed, the district court found that "the whole purpose of the trust was to attempt to remove from the reach of the IRS the mineral interest and any royalties to which Ronald was or would be entitled." The court noted that Holden himself had acknowledged that, "if Ronald's purpose had been merely to sue Michael to obtain a share of the mineral rights and royalties, he could have simply retained Izen to pursue the claim on a contingency fee basis and wouldn't have needed any sort of trust or transfer of property." As a result, the district court declared the transfer to be "null and void" and held "the federal tax liens are senior to any interest in the property claimed by Ronald Leathers, the Dirt Cheap Mine Trust, or James Holden." The court accordingly held that the government was entitled to a final judgment against Ronald in the amount of $1,545,779.36, which represented Ronald's current, combined tax obligations for the years 1997 through 2005.

Finally, the district court granted Izen's request for attorney fees, in part. Izen requested a total of $164,178.16 in fees and costs, but the court awarded him a total of $39,689.88. Pursuant to 26 U.S.C. § 6323(b)(8), the court held Izen had a lien in that amount which was superior to the federal tax liens.

### 5. Post-Judgment

The September 2015 Order disposed of all remaining issues in the case. On the same day the order was issued, the court entered a judgment which briefly summarized its various rulings throughout the bifurcated proceedings. On October 23, 2015, Holden

23

and Izen together filed a "motion for new trial and motion for amended and/or additional findings," and Izen separately filed a "motion for rehearing or new trial and motion for amended and/or additional findings." The district court denied both motions on November 19, 2015.

Ronald filed a timely appeal from the district court's judgment, and Holden and Izen jointly filed a separate appeal. Although the three acted together in the district court, with Izen representing both Ronald and Holden in his capacity as Trustee, their interests are not aligned on appeal. Theresa's appellate interests are being pursued by her successors, Ronda R. Olson and Rustin R. Leathers, but for the sake of clarity, we continue to refer to the claims as Theresa's. We have jurisdiction under 28 U.S.C. § 1291.

In the interest of clarity, we address the substantive aspects of the two appeals separately, beginning with Ronald's appeal before turning to Holden and Izen's. For the reasons set forth below, we affirm the district court's judgment on all grounds.

### III. CASE NO. 15-3264, RONALD'S APPEAL

Ronald lists ten issues in the statement of issues section of his brief, but the argument section does not address each issue. We have identified the issues Ronald actually briefs as: (1) the state court lacked subject matter jurisdiction over the initial quiet title actions because Michael did not have standing, and therefore the state court's orders are void; (2) the district court also lacked subject matter jurisdiction; (3) Izen's simultaneous representation of Ronald and Holden created a conflict of interest; (4) the Dirt Cheap Mine Trust is a sham trust; (5) Ronald's mineral interest and royalties were taken in violation of due process; and (6) the district court erred in limiting Michael's

24

potential liability for unjust enrichment damages to misapplied payments received in December 2006 or later. We address and reject these arguments in turn.

### A. *The State Court's Jurisdiction*

Ronald first contends that Michael lacked standing to bring the underlying quiet title actions in Kansas state court and that the state court therefore lacked subject matter jurisdiction.[7] Specifically, Ronald argues Michael had no legitimate claim to the one-half mineral interest and therefore could not bring an action under the Kansas quiet title statute, Kansas Statutes Annotated § 60-1002.[8] According to Ronald, because the state court did not have jurisdiction, its "orders . . . allowing Attorney Izen to practice, Michael to amend his petition, and the United States to be added as an indispensable party are void." We disagree.

"[S]tanding is a jurisdictional issue in Kansas."[9] *Mid-Continent Specialists, Inc. v. Capital Homes, L.C.*, 106 P.3d 483, 488 (Kan. 2005). "The issue of whether a party has

---

[7] Aside from the issue of standing, the state court otherwise had jurisdiction because it is the court located in the same county as the Property. *See* Kan. Stat. Ann. § 60-601(b)(1); *see also Crone v. Nuss*, 263 P.3d 809, 820 (Kan. App. 2011) ("The trial court, being in the county in Kansas in which the disputed land was situated, acquired the jurisdiction to determine each party's interest." (citing Kan. Stat. Ann. §§ 60-601(b)(1), 60-1002)).

[8] Although Ronald's heading introducing the standing discussion invokes the federal-law concepts of "Article III standing" and "prudential standing," he does not reference either of these federal concepts in the argument section. Rather, Ronald cites only to Kansas law.

[9] The parties assume Kansas law controls the question of whether Michael had standing to bring the underlying quiet title actions in state court. *Cf. City of Moore v. Atchison, Topeka, & Santa Fe Ry. Co.*, 699 F.2d 507, 511 (10th Cir. 1983) (applying state law to determine standing in case removed to federal court on the basis of diversity).

standing in a judicial action . . . presents a question of law." *Sierra Club v. Moser*, 310 P.3d 360, 367 (Kan. 2013). Like other jurisdictional issues, we review questions of standing de novo. *Meyer v. Christie*, 634 F.3d 1152, 1156 (10th Cir. 2011); *accord Mid-Continent Specialists*, 106 P.3d at 488.

Under Kansas law, "[s]tanding to sue means that a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Dutoit v. Bd. of Cty. Comm'rs*, 667 P.2d 879, 887 (Kan. 1983). A plaintiff must satisfy both the relevant statutory standing requirements, if any, as well as traditional or common-law standing requirements. *See Moser*, 310 P.3d at 367–69. "[T]o demonstrate common-law or traditional standing, a person suing individually must show a cognizable injury and establish a causal connection between the injury and the challenged conduct." *Id.* at 369.

Kansas's quiet title statute creates a "[r]ight of action" that "may be brought by any person claiming title or interest in personal or real property, including . . . mineral or royalty interests, against any person who claims an estate or interest therein adverse to him or her, for the purpose of determining such adverse claim." Kan. Stat. Ann. § 60-1002(a). "Thus, in order to properly bring a quiet title action pursuant to the statute, a person must claim 'title or interest' in the real property." *Dubowy v. Baier*, 856 F. Supp. 1491, 1497 (D. Kan. 1994) (discussing Kan. Stat. Ann. § 60-1002). The person against whom the action is brought must "claim[] an estate or interest therein which is adverse to that of the owner" who filed the action, and "[t]he action may be brought for the purpose of determining such adverse claims." *LaBarge v. City of Concordia*, 927 P.2d 487, 494

26

(Kan. App. 1996) (internal quotation marks omitted). "Ordinarily a quiet title action is brought to remove a cloud from the title . . . ." *Ford v. Sewell*, 366 P.2d 285, 289 (Kan. 1961).

Here, Michael had standing under § 60-1002. In his original petitions filed January 5, 2007, Michael claimed ownership of the disputed one-half mineral interest by virtue of the Quit Claim Deed and asked that title to that interest be quieted in him. He also detailed the ways in which the "clouded title" to this interest was impeding royalty payments, and he identified "at least three conflicting claims to the undivided [one-half] interest": his own claim, Ronald's (and the Trust's) claim, and Theresa's claim. Thus, we have here "a factual situation which . . . meet[s] the definition of a quiet title action: two [or more] parties asserting adverse interests with regard to certain mineral rights." *Ferrell v. Ferrell*, 719 P.2d 1, 4 (Kan. App. 1986).

Ronald seeks to confute Michael's standing by arguing, essentially, that Michael either (1) *could not* "claim" the one-half mineral interest because the divorce court had already distributed that interest and Michael had testified in the divorce case that Ronald owned the interest; or (2) *did not* "claim" the interest because he eventually changed his position and conceded to the interest being allocated to Ronald and Theresa. Ronald also seems to argue that Michael could not or did not claim ownership of the one-half mineral interest because the interest was never transferred to Michael in the first place.

But these arguments ignore several critical and undisputed facts. First, the Deed did transfer Ronald's one-half mineral interest in the Property to Michael, as the district court concluded. Although the district court further found that this transfer was

27

unintended, the Deed nonetheless made Michael the legal owner of 100 percent of the mineral estate in the Property. And because the Deed had not yet been reformed at the time of the divorce decree, the divorce court's allocation of one-half of the mineral estate between Ronald and Theresa further clouded title. Michael's testimony in the divorce case reflects that he knew there was a title problem but believed it eventually would be resolved in Ronald's favor. By the time Michael filed his quiet title action, he had revised his position to claim ownership of the entire mineral estate based on the Deed. In short, Michael had a valid claim to the disputed mineral interest by virtue of the Deed, and Ronald's contention to the contrary is meritless.

Nor does Michael's eventual desertion of his claim to the interest deprive him of standing, which is measured as of the time a plaintiff files suit. *See U.S. Bank Nat'l Ass'n v. McConnell*, 305 P.3d 1, 6–8 (Kan. App. 2013); *accord Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*." (emphasis added)); *Brown v. Buhman*, 822 F.3d 1151, 1164 (10th Cir. 2016). Although Ronald alleges that Michael abandoned his pursuit of the half interest in the mineral estate "[o]ne week after the filing of his amended petition," Ronald fails to mention that the amended petition was itself filed more than a year after the initial quiet title petitions. Ronald points to no authority suggesting that Michael's later change of position can override the standing conferred by his initial pleadings asserting his legitimate claim to ownership under the Deed.

Ronald also ignores the fact that Michael's change in position occurred *after* Ronald himself had asserted various counterclaims and crossclaims and had asked the state court to reform the Deed and quiet title to the disputed interest. In Kansas, "[a]s a general rule a . . . counterclaim or cross-claim has the nature, characteristics and effect of an independent action or suit by one party against another. Accordingly, . . . a demand pleaded by way of a . . . counterclaim or cross-claim is regarded as an affirmative action . . . ." *Mynatt v. Collis*, 57 P.3d 513, 525 (Kan. 2002) (internal quotation marks omitted). Ronald does not dispute the state court's jurisdiction over these independent claims seeking the same relief as Michael's initial actions. Thus, even if we were convinced that Michael's decision mid-litigation to relinquish his claim to one-half of the mineral estate affected the state court's jurisdiction over Michael's § 60-1002 claims, we still would conclude the state court had jurisdiction over the case by virtue of the counterclaims and crossclaims. *Cf. Caplinger v. Carter*, 676 P.2d 1300, 1304 (Kan. App. 1984) (stating that a counterclaim can remain pending for independent adjudication even after the plaintiff's claims have been dismissed).

We therefore reject Ronald's argument that the state court lacked subject matter jurisdiction and his corresponding claim that the state court's orders are void.

### B. *The District Court's Jurisdiction*

Ronald also contends the federal district court lacked subject matter jurisdiction and that its orders, too, are void. Reviewing the issue de novo, *see Knight v. Mooring*

*Capital Fund, LLC*, 749 F.3d 1180, 1183 (10th Cir. 2014), we reject Ronald's arguments and conclude the district court had jurisdiction.[10]

Ronald first argues that the district court lacked jurisdiction because the state court lacked jurisdiction, due to Michael's alleged lack of standing. Because we have concluded that the state court did have jurisdiction, we reject this contention.

Next, Ronald seems to assert that the district court did not have federal question jurisdiction over the Kansas quiet title claims. But the district court's assertion of subject matter jurisdiction did not rest on federal question jurisdiction. When Michael learned of the federal tax liens on Ronald's property and added the United States as a necessary party to the state-court litigation, he did so under the authority of 28 U.S.C. § 2410, which waives the United States' sovereign immunity with respect to state-court quiet title actions concerning property over which the government has asserted a lien.[11] *See* 28 U.S.C. § 2410(a); *Guthrie v. Sawyer*, 970 F.2d 733, 735 (10th Cir. 1992). "As a trade off for the waiver of sovereign immunity, [28 U.S.C. § 1444] permits the government to

---

[10] In their answer to Ronald's opening brief in Case No. 15-3264, Holden and Izen agree that Michael had standing in the state court and that the district court generally had jurisdiction, but they argue the district court did not have jurisdiction to issue certain rulings concerning Theresa Leathers. We address their contentions on this latter point in our discussion of their appeal, Case No. 15-3280, below.

[11] While Michael's amended petition does not expressly reference 28 U.S.C. § 2410, it satisfies the mandatory pleading requirements of § 2410(b) with deliberate precision. *See Dahn v. United States*, 127 F.3d 1249, 1251 (10th Cir. 1997) (explaining that pleading must comply with requirements of § 2410(b) to invoke the statutory waiver of sovereign immunity in § 2410(a)). Michael also complied with the service requirements of § 2410(b), and the summons does reference that statutory provision explicitly.

remove to federal court any such case initiated in state court."[12] *Hussain v. Boston Old Colony Ins. Co.*, 311 F.3d 623, 629 (5th Cir. 2002).

Section 1444 gives the United States "a substantive right to remove, independent of any other jurisdictional limitations." *Id.* (internal quotation marks omitted); *see also Hudson Sav. Bank v. Austin*, 479 F.3d 102, 105 (1st Cir. 2007) ("28 U.S.C. § 1444 . . . confers upon the federal government an absolute right to remove to federal court [quiet title] actions in which it is named as a defendant . . . ."). In other words, at the time this case was removed, the district court's jurisdiction was premised on §§ 2410 and 1444, and not, as Ronald claims, on 28 U.S.C. § 1331. *See City of Joliet v. New West, L.P.*, 562 F.3d 830, 833 (7th Cir. 2009) ("[T]he presence of the national government as a party with a security interest in the real estate supplies jurisdiction." (citing 28 U.S.C. §§ 1444, 2410)); *Hussain*, 311 F.3d at 629 ("Once the applicability of § 2410(a) is established, federal subject matter jurisdiction is present on the basis of § 1444."); *see also Quality Loan Serv. Corp. v. 24702 Pallas Way*, 635 F.3d 1128, 1131–32 (9th Cir. 2011); 14C Charles Alan Wright et al., *Federal Practice and Procedure* § 3728, at 307 (4th ed. 2009). We therefore reject this argument, too.[13]

---

[12] 28 U.S.C. § 1444 provides: "Any action brought under section 2410 of this title against the United States in any State court may be removed by the United States to the district court for the district and division in which the action is pending."

[13] Although § 1444 supplies a valid basis for removal and federal jurisdiction in this case, the United States did not expressly invoke § 1444 in its notice of removal. This omission looks to have been an inadvertent oversight, but we note that even if it could have rendered the removal procedure defective in some way, the defect would not alter our decision. This is because the United States' crossclaim against Ronald under 26 U.S.C. § 7401, asserted promptly upon removal, provided an independent basis for the

31

Finally, Ronald spends two or three sentences articulating his belief that the district court was precluded by "the doctrines of res judicata and *Rooker-Feldman*" from reforming the Quit Claim Deed because the prior divorce decree already established that Ronald owned the one-half mineral interest. While it is not apparent how these arguments relate to the district court's subject matter jurisdiction, we need not dwell on that question because both points can be rejected on the merits.

The res judicata contention is inadequately briefed and therefore waived, as Ronald cites no legal authority and offers no explanation beyond his bare assertion that res judicata precludes reformation in this case. *See United States v. Pursley*, 577 F.3d 1204, 1228 (10th Cir. 2009) (rejecting an argument a party "mention[ed], but d[id] not justify," and did "not cite a single case to support," under "the principle that arguments inadequately briefed in the opening brief are waived" (alteration and internal quotation marks omitted)). This contention is also meritless, as Michael was not a party to, and neither quiet title nor reformation was litigated in, the divorce case. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1239 (10th Cir. 2017) (stating that two of the requisite elements of res judicata are "identity of parties or privies in the two suits" and "identity of the cause of action in both suits" (internal quotation marks omitted)).

---

district court's jurisdiction from that point forward. *See* 26 U.S.C. § 7402; 28 U.S.C. §§ 1331, 1340, 1345, 1367. And an error in a statutory removal procedure does not warrant reversal of a judgment on appeal if "the federal trial court would have had original jurisdiction of the controversy had it been brought in the federal court in the posture it had at the time . . . of the entry of the judgment." *See Feichko v. Denver & Rio Grande W. R.R. Co.*, 213 F.3d 586, 590–91 (10th Cir. 2000) (quoting *Am. Fire & Cas. Co. v. Finn*, 341 U.S. 6, 16 (1951)); *accord Caterpillar Inc. v. Lewis*, 519 U.S. 61, 72–73 (1996).

32

The argument concerning *Rooker-Feldman*—a doctrine Ronald recognizes "is not a jurisdictional matter"—fails for equally straightforward reasons. "*Rooker-Feldman* precludes federal district courts from effectively exercising appellate jurisdiction over claims actually decided by a state court and claims inextricably intertwined with a prior state-court judgment." *Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1233 (10th Cir. 2006) (internal quotation marks omitted). The doctrine "is confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Here, the quiet title and reformation claims were not addressed by the state divorce court, and the district court did not review or reject the divorce court's judgment. Furthermore, as a non-party to the state divorce proceedings, Michael cannot be deemed a state court "loser." The *Rooker-Feldman* doctrine therefore does not apply.

Thus, we conclude the district court had jurisdiction and reject Ronald's various arguments to the contrary.

### C.  *Conflict of Interest*

Ronald's next complaint is that Izen had an undisclosed conflict of interest and should not have been representing Ronald in the district court proceedings. Ronald's treatment of this claim in his brief begins with a page-long quote of paragraphs (a) and (b) of ABA Model Rule of Professional Conduct 1.7. Paragraph (a) forbids representation that involves a concurrent conflict of interest, and paragraph (b) lists circumstances under which the representation may proceed despite a concurrent conflict. *See* Model Rules of

33

Prof'l Conduct r. 1.7(a)–(b) (Am. Bar Ass'n 2014). Immediately following this excerpt, Ronald contends that Izen "violated every subsection."

We need not decipher the particulars of Ronald's argument or decide whether a conflict existed because, regardless, this issue is inadequately briefed and is not properly before us. Aside from the quoted ABA Rule, Ronald cites to no legal authority, and his discussion consists largely of tangential references to other substantive areas of the case. *Cf. Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1249 (10th Cir. 2015) (declining to consider argument as "unsupported and inadequately briefed" where the allegations offered in support of the argument were "in most cases vague, confusing, conclusory, and unsupported by record evidence").[14] Plus, this argument is forfeited because Ronald did not raise it in the district court. *See Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 861 (10th Cir. 2007). Although it may have been difficult for him to do so, since Izen was his attorney at that time, Ronald does not provide any authority outlining an exception to the application of normal forfeiture principles in a situation such as this or even offer a theoretical rationale for such an exception. We therefore decline to consider the merits of this issue. *See Namoko v. Cognisa Sec., Inc.*, 264 F. App'x 753, 755 (10th Cir. 2008)

---

[14] Even if his argument had been coherently briefed, Ronald does not ask for any specific relief on the basis of this asserted conflict. We have held before that deciding an issue under these circumstances would amount to rendering an advisory opinion, which is something we cannot do. *See Pub. Serv. Co. of Colo. v. EPA*, 225 F.3d 1144, 1148 n.4 (10th Cir. 2000) ("This court would violate Article III's prohibition against advisory opinions were it to [decide a question of law] without ordering some related relief."); *United States v. Burlington N. R.R. Co.*, 200 F.3d 679, 699 (10th Cir. 1999) (similar); *cf. Mercado v. Wiley*, 200 F. App'x 765, 766 (10th Cir. 2006) (unpublished) (denying motion submitted with appellate brief because it did "not appear to request any relief that we have authority to grant").

34

(unpublished) (declining to consider for the first time on appeal plaintiff's argument that

his counsel in the district court violated the Colorado Rules of Professional Conduct).[15]

## D. *Limitation on Unjust Enrichment Liability*

Finally, Ronald argues the district court erred in concluding that Michael's

liability for unjust enrichment should be limited to misapplied payments he received in or

after December 2006, which the district court found to be the point at which Michael

realized he was being overpaid. The district court based this determination on the second

element of an unjust enrichment claim under Kansas law, which requires that "the

defendant appreciated and has knowledge of the benefit" conferred on him by the

---

[15] Ronald raises two additional arguments that we decline to consider for similar reasons. First, Ronald asks us to "declare the [Dirt Cheap Mine] Trust a sham and, as such, issue any orders necessary to remove it from this case, terminate its existence, set aside any judgment in favor of the Trust, and bar it from filing any further pleadings or claims in this matter." We reject this argument as inadequately briefed and irrelevant. Ronald points to no record evidence, and cites to no relevant legal authority, in support of this contention. *See Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1249 (10th Cir. 2015); *United States v. Pursley*, 577 F.3d 1204, 1228 (10th Cir. 2009). Nor does he explain why consideration of this issue on appeal is appropriate, where the district court saw no need to decide whether the Trust—as opposed to the transfer in avoidance of the tax lien—was a sham.

Second, Ronald contends, in passing, that the state and district courts' "lack of subject matter jurisdiction, coupled with the fraudulent nature of the Trust and actions by Holden and Attorney Izen, denied Ronald due process in the taking of his mineral interest and royalties." As discussed, however, the state and federal trial courts had jurisdiction. And Ronald offers nothing in support of his due process claim other than a citation to *Automatic Feeder Co. v. Tobey*, 558 P.2d 101, 104 (Kan. 1975), which states the unremarkable proposition that a court's judgment is void if the court acted in a manner inconsistent with due process. As a result, we reject this argument as inadequately briefed and frivolous.

plaintiff.[16] *See Univ. of Kan. Hosp. Auth. v. Bd. of Comm'rs*, 327 P.3d 430, 441 (Kan. 2014). But according to Ronald, knowledge is a prerequisite for an unjust enrichment claim to accrue and for the statute of limitations to commence, but it is not a limit on restitution of amounts received before the defendant gained that knowledge. Ronald maintains the district court erred in giving the requirement the latter effect.[17]

While this argument, if properly raised, might present an interesting issue, we decline to consider it on the merits. Like so many of the arguments Ronald raises on appeal, this argument is not adequately briefed. Ronald simply states that the second element of unjust enrichment "does not create a bar of recovery for a benefit conferred before the Defendant knew of the benefit" without elaborating further or citing any legal authority in support. Thus, we are free to end our inquiry by deeming this contention waived. *See Phillips v. Calhoun*, 956 F.2d 949, 953 (10th Cir. 1992) (declining to consider argument that was not "minimally supported by legal argument or authority").

But the argument also fails because Ronald cannot raise it. Ronald is not the real party in interest for the unjust enrichment claim because he assigned his choses in action

---

[16] Kansas law requires a plaintiff bringing an unjust enrichment claim to establish the following elements: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated and has knowledge of the benefit; and (3) the defendant accepted and retained the benefit under circumstances that make the retention unjust." *Univ. of Kan. Hosp. Auth. v. Bd. of Comm'rs*, 327 P.3d 430, 441 (Kan. 2014).

[17] The district court's finding, in the May 2010 Order, that Michael did not have knowledge of the benefit being conferred until December 2006 formed the basis for the court's subsequent decision, in the August 2013 Order, to limit Michael's damages on the unjust enrichment claims to a maximum of $32,665.96. This figure represents royalty payments associated with the disputed one-half mineral interest that were paid to Michael from December 2006 to October 2008, when those royalties began to be held in a suspense account.

to Holden, who settled the claim through a stipulated judgment. *See Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 674–75 (10th Cir. 2007) ("Kansas law requires that every legal action be prosecuted by the real party in interest. . . . Where the injured party assigns all of his rights to a third party, the assignee becomes the real party in interest and the assignor can no longer pursue a claim on his own behalf."). Ronald does not contest that a claim for unjust enrichment is an assignable chose in action under Kansas law. *See Bolz v. State Farm Mut. Auto. Ins. Co.*, 52 P.3d 898, 901 (Kan. 2002) ("It has long been recognized in Kansas that all choses in action, except torts, are assignable."); *Regal Ware, Inc. v. Vita Craft Corp.*, 653 F. Supp. 2d 1146, 1151 (D. Kan. 2006) ("[U]njust enrichment is a quasi-contractual remedy, not a tort."). Nor does he address, let alone offer a reason for us to reject, the district court's conclusion that he "has waived or is estopped from challenging Holden's settlement of the unjust enrichment claim with [Michael], based on [his] representation that Holden was his assignee on this claim."

Because this argument is inadequately briefed, and because the unjust enrichment claim has been assigned and settled, we reject Ronald's challenge to the district court's statute of limitations ruling with respect to that claim.

\*     \*     \*

For the reasons set forth above, we conclude Ronald has raised no valid challenge to the district court's rulings. We therefore affirm the district court's judgment on all grounds raised in Case No. 15-3264. Having done so, we now turn to the substantive issues raised in Case No. 15-3280.

37

## IV. CASE NO. 15-3280, HOLDEN AND IZEN'S APPEAL

In their separate appeal, Holden and Izen present eight issues for our consideration. Distilled and grouped together where sensible, their arguments are as follows: (1) the district court erred in allocating to Theresa 25 percent of the mineral rights appurtenant to the Property; (2) the district court erred in concluding Ronald and Holden's conversion counterclaim was barred by the statute of limitations; (3) the district court erred, both procedurally and substantively, in determining that Ronald's transfer of his choses in action to the Dirt Cheap Mine Trust was fraudulent with respect to Ronald's tax debt to the IRS; and (4) the district court abused its discretion in resolving Izen's request for attorney fees.

Addressing these arguments in turn, we reject them all and affirm the district court's decision in full.

### A. *Arguments Concerning Theresa's Interest*

Holden and Izen begin with several arguments for why the district court erred in awarding Theresa half of Ronald's one-half mineral interest based on the state divorce decree. The premise on which all these arguments rest is Holden and Izen's belief that the divorce court's distribution of the mineral interest between Ronald and Theresa was void because, due to the error in the Quit Claim Deed, Ronald did not then own the interest. According to Holden and Izen, the district court therefore effectively reopened and corrected or modified the divorce decree when it allocated half of Ronald's interest to Theresa. This, they argue, was impermissible both under the applicable statute of limitations and because of a jurisdictional bar.

38

But the key assumption underlying Holden and Izen's arguments—i.e., that the divorce court's division of the mineral interest is void because Ronald did not own the interest at the time of the divorce—is flawed. Holden and Izen fail to acknowledge the district court's conclusion that, because the reformation of the Deed relates back to the Deed's execution, Ronald did own the interest during the divorce and the divorce court therefore had authority to distribute half of that interest to Theresa. As we now explain, the district court's conclusion is correct, and as a result, Holden and Izen's arguments necessarily fail. We review the district court's legal conclusions de novo. *Smalley & Co. v. Emerson & Cuming, Inc.*, 13 F.3d 366, 367 (10th Cir. 1993) ("When considering a grant of summary judgment we review the district court's conclusions of law de novo . . . .").

Under Kansas law, "[r]eformation is an equitable remedy available to correct mutual mistakes of fact." *Conner v. Koch Oil Co.*, 777 P.2d 821, 825 (Kan. 1989). "When a mutual mistake is made in describing property in a deed and the instrument does not convey the property intended, the deed may be reformed to conform to the parties' original intentions." *Unified Gov't of Wyandotte Cty./Kan. City v. Trans World Transp. Servs., L.L.C.*, 227 P.3d 992, 997 (Kan. App. 2010). "This is because when property is included in a deed by mutual mistake and the parties never intended such property to be conveyed, the grantor is under no obligation to convey such property, and the grantee has no right to retain such property." *Id.* Here, the district court concluded that neither Michael nor Ronald intended for Ronald to convey his one-half mineral interest when he executed the Quit Claim Deed, and that the failure of the Deed to reserve Ronald's

mineral interest was a mutual mistake. The court accordingly reformed the Deed such that Ronald's one-half mineral interest was reserved to him. Holden and Izen do not contend reformation for mutual mistake was improper.[18] But their arguments neglect one of that doctrine's principal consequences.

In Kansas, as elsewhere, "reformation of an instrument relates back, and takes effect from, the time of its original execution, and binds all entities except innocent purchasers for value." *Conner*, 777 P.2d at 825; *see also* 66 Am. Jur. 2d Reformation of Instruments § 9 ("The reformation of an instrument relates back to the time the instrument was originally executed and simply corrects the document's language to read as the instrument should have read all along. A reformed instrument takes effect from the time of its original execution and binds all entities except innocent purchasers for value."). The district court therefore concluded that reformation of the Deed was effective as of its execution on May 11, 1998. As a result, the court further determined that Ronald owned the one-half mineral interest at the time of the divorce proceeding in 2001 and 2002, and the divorce court properly distributed it as part of the marital estate.

Although we have found no Kansas case dealing directly with a court's prior disposition of property belonging to a party whose ownership of the property was only later validated upon reformation, the district court's ruling here follows naturally from the relation-back rule as stated and applied in *Conner*. *See* 777 P.2d at 823–26. And that ruling is supported by this court's and other courts' decisions applying Colorado and

---

[18] The district court concluded, and no party disputes on appeal, that the parties waived the five-year statute of limitations on reformation actions. *See* Kan. Stat. Ann. § 60-511(5).

40

Oklahoma law, which embrace the same relation-back principle as Kansas law.[19] *See, e.g.*, *Chapman v. Denman*, 190 F. App'x 640, 644 (10th Cir. 2006) (unpublished) (applying Colorado law) ("[P]laintiff argues that Pitkin County never owned the [land] until 2004 when the district court entered its order reforming the treasurer's deed. To the contrary, the reformed deed was retroactive to 1954, and from that point forward the [land] was owned by the County . . . ."); *accord Bd. of Comm'rs v. Timroth*, 87 P.3d 102, 109 (Colo. 2004); *Foley v. Worthington*, 209 P.2d 871, 871–72 (Okla. 1949).

For these reasons, the district court correctly determined that Ronald owned the one-half mineral interest when the divorce decree was entered in 2002 because the reformation of the Deed related back to May 11, 1998. It follows from this conclusion that Holden and Izen's principle arguments against Theresa's entitlement to half of Ronald's mineral interest must fail.

Their first contention is that Theresa's claims are barred by the one-year statute of limitations on requests for relief from final judgments, contained in Kansas Statutes Annotated § 60-260(b), because she is seeking to set aside the divorce decree. *See In re Marriage of Reinhardt*, 161 P.3d 235, 236–37 (Kan. App. 2007) (explaining that "K.S.A. 60-260(b) allows relief from a final judgment for several reasons," the first three of

---

[19] It also is consistent with the general rule that "[a] grantee of property succeeds to the grantor's right to maintain a suit to reform a prior deed; thus, a grantee is entitled to the grantor's right to enforce the correction of a description in a prior deed to a part of the premises executed by the grantor to another." 66 Am. Jur. 2d Reformation of Instruments § 60 (footnote omitted). A necessary precondition of this principle is that, despite the then-uncorrected error in the prior deed, the grantor's conveyance to the grantee is valid as to the affected aspect of the property, at least assuming reformation is eventually obtained.

which "must be filed within 1 year after the judgment was entered"). As noted, this argument rests on the false premise that the divorce court was without authority over Ronald's mineral interest and the divorce decree's purported allocation of that interest was void, thereby making Theresa's claim an attempt to alter the decree. We reject this argument for the same reason the district court did: "[Holden and Izen] fail[] to address the fact that Theresa is not attempting to set aside the divorce decree, but she is asking the court to enforce the divorce decree. The statute of limitations is not applicable as Theresa . . . is not attempting to obtain relief from the final judgment of the divorce court."[20]

Holden and Izen's second contention is also premised on the misconception that the district court had to reopen and modify the divorce decree to award Theresa 25 percent of the mineral rights. They argue that, under the "domestic relations exception" to federal jurisdiction, the district court lacked jurisdiction to reopen and modify the divorce decree such that it validly distributed half of Ronald's interest to Theresa. The domestic relations exception divests federal courts of the power to issue divorce, alimony, and child custody decrees. *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992). But as we have explained, and as the district court itself stated, Theresa did not ask the district court to reopen, reissue, correct, or modify Theresa and Ronald's divorce decree, and the court did none of those things. Rather, the court enforced the divorce decree according to its terms. The Supreme Court has long "sanctioned the exercise of federal jurisdiction over

---

[20] Holden and Izen also briefly invoke the two-year statute of limitations on actions to recover personal property, set forth in Kansas Statutes Annotated § 60-513(2), as an alternative to Kansas Statutes Annotated § 60-260(b). Even if this provision applied to the claims here, Holden and Izen's invocation of it fails for the same reasons as their invocation of § 60-260(b).

the enforcement of [a domestic-relations] decree that ha[s] been properly obtained in a state court of competent jurisdiction." *See Marshall v. Marshall*, 547 U.S. 293, 307 (2006) (quoting *Ankenbrandt*, 504 U.S. at 702). Thus, the domestic relations exception is not applicable.

Finally, Holden and Izen argue that the mineral interest and associated royalties distributed to Theresa should be subject to the federal tax liens on Ronald's property. This argument also hinges on the premise that the award of 25 percent of the mineral interest and royalties to Theresa in the divorce decree is invalid. If, as they contend, the divorce decree is void, then Ronald owns 50 percent of the mineral estate after reformation and any tax liens should attach, if at all, to the entire 50 percent interest. But we reject Holden and Izen's argument that the divorce decree was void and the award to Theresa invalid. And because the United States has not otherwise attempted to recover any of Ronald's tax debt from Theresa's 25 percent mineral interest and has expressly disclaimed any right it may have had to enforce the federal tax liens against her interest, Theresa's interest is not subject to the IRS's liens.

Accordingly, we affirm the district court's determinations on summary judgment that Theresa is entitled to 25 percent of the mineral rights appurtenant to the Property and that her interest is not subject to the tax liens.

### B. *Conversion Counterclaim*

Holden and Izen next argue that the district court erred in finding Holden and Ronald's conversion counterclaim barred by the two-year statute of limitations set forth in Kansas Statutes Annotated § 60-513(a)(2). In their view, a claim of conversion accrues

under Kansas law only after the rightful owner of property has demanded the return of the property and the person holding it refuses. They contend that, here, the demand and refusal occurred in November 2005, when Ronald and Michael exchanged letters about the mistake in the Deed and the resulting issues concerning royalty payments. Thus, Holden and Izen maintain that the statute of limitations did not begin to run until November 2005, rendering the February 2007 filing of the conversion counterclaim timely.[21]

The district court rejected this argument in its May 2012 Order, finding that the facts here do not require a demand to trigger the statute of limitations. Instead, the court reasoned that the limitations period began to run when the alleged conversion became "reasonably ascertainable" to Ronald. Because the court determined that this occurred in 2002, it concluded that the statute of limitations expired well before the 2007 filing of the counterclaim. Reviewing the district court's decision de novo, *Burton v. R.J. Reynolds Tobacco Co.*, 397 F.3d 906, 914 (10th Cir. 2005) ("Review of the district court's

---

[21] The conversion counterclaim was first asserted in an amended pleading filed in July 2011, but the parties believe this amended pleading relates back to Ronald and Holden's initial pleading, filed February 9, 2007. Both the Federal and Kansas Rules of Civil Procedure allow for such relation-back where certain requirements are satisfied, including that the "law that provides the applicable statute of limitation allows relation back." Fed. R. Civ. P. 15(c)(1); Kan. Stat. Ann. § 60-215(c)(1). Because the parties do not specifically address this requirement, we assume, without deciding, that the July 2011 amended pleading relates back to the February 2007 initial pleading.

application of the statute of limitations is de novo."), we agree that the conversion action is time-barred.[22]

The tort of conversion is defined in Kansas as "the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights." *Bomhoff v. Nelnet Loan Servs., Inc.*, 109 P.3d 1241, 1246 (Kan. 2005). "A conversion may be based upon the detention of or unreasonable withholding of possession from one who has the right to possess it." *Queen v. Lynch Jewelers, LLC*, 55 P.3d 914, 921 (Kan. App. 2002) (citing 18 Am. Jur. 2d Conversion § 47). "Under Kansas law, conversion is a strict liability tort. The required intent is shown by the use or disposition of property belonging to another, and knowledge or ignorance as to ownership of the property is irrelevant." *Millennium Fin. Servs., L.L.C. v. Thole*, 74 P.3d 57, 64 (Kan. App. 2003) (alterations and internal quotation marks omitted).

The statute of limitations for conversion is two years. *See* Kan. Stat. Ann. § 60-513(a)(2). As relevant here, a cause of action for conversion typically accrues—and thus starts the clock on the limitations period—when "the fact of injury becomes reasonably ascertainable to the injured party." *Id.* § 60-513(b); *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 378 P.3d 1090, 1096 (Kan. 2016). As this court has explained, "[t]he phrase 'reasonably ascertainable' means that a plaintiff has the obligation to

---

[22] Michael argues in the alternative that Holden is not the real party in interest with respect to the conversion counterclaim—and therefore cannot pursue the claim on appeal—because torts are not assignable under Kansas law. We exercise our discretion to resolve this issue on the merits and therefore do not reach Michael's alternative argument.

45

reasonably investigate available sources that contain the facts of the injury and its wrongful causation." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 630 (10th Cir. 2008) (alteration omitted) (quoting *Kelley v. Barnett*, 932 P.2d 471, 474 (Kan. App. 1997)). "'[R]easonably ascertainable' does not mean 'actual knowledge.'" *Id.* (quoting *Davidson v. Denning*, 914 P.2d 936, 948 (Kan. 1996)).

As noted above, the district court found, with ample record support, that Michael's erroneous receipt of royalty payments belonging to Ronald was reasonably ascertainable to Ronald well outside of the limitations period. On appeal, Holden and Izen do not challenge the district court's application of the "reasonably ascertainable" standard in § 60-513(b). *See* Kan. Stat. Ann. § 60-513(a). Instead, they assert that a different standard controls commencement of the limitations period in this case. We are not convinced.

Holden and Izen rely on an exception to the "reasonably ascertainable" standard, claiming that the limitations period could not begin to run until after Ronald made demand on Michael to turn over the misdirected royalty payments. As support for this argument, they cite to the Kansas Court of Appeals' decision in *Clark Jewelers v. Satterthwaite*, a case in which a jewelry store sued to foreclose a security interest in a bridal set that had been given by the purchaser to his spouse. *See* 662 P.2d 1301, 1303 (Kan. App. 1983). The trial court in that case apparently construed the store's claim as one for conversion and then determined that the claim was barred by the two-year statute of limitations, which the trial court found was triggered on the date the balance of the purchase money for the bridal set was due. *Id.* at 1303–04.

46

The Kansas Court of Appeals disagreed that a claim for conversion accrued at that time. The court, finding that the spouse rightfully and lawfully had possession of the bridal set when she received it, determined that her husband's subsequent default did not automatically render her possession wrongful. *Id.* at 1304. It reasoned that "[b]ecause . . . [the spouse] rightfully came into possession of the bridal set, she was entitled to retain possession of that property until such time as [the jewelry store] had gained the right to repossess, *had made demand upon her*, and she had refused to deliver the bridal set to [the store]. Then and only then could [she] have committed the tort of conversion." *Id.* at 1304–05 (emphasis added). The court therefore concluded the statute of limitations began to run not when the outstanding balance was due, but rather when the jewelry store's president later visited the spouse's home to demand that she return the bridal set. *Id.* at 1305.

The reasoning in *Clark Jewelers* tracks the general principle that, under certain circumstances, a "demand and refusal" is required before the tort of conversion can be considered complete. *See* 18 Am. Jur. 2d Conversion § 105 ("Where a demand for the return of the property is necessary to make the tort of conversion complete, the statute of limitations does not begin to run until the demand has been duly made, and the defendant has wrongfully refused to surrender the property." (footnote omitted)). For instance, "[a] demand is absolutely necessary where the original taking was lawful, the defendant was rightfully in possession, and there was no assumption of ownership, wrongful use, or any act of conversion, prior to the demand." *Id.* § 75 (footnotes omitted).

47

But here, the district court distinguished *Clark Jewelers* and this category of cases, reasoning that a demand is not a necessary part of the conversion claim in this case because "[i]f Michael possessed royalty payments that belonged to Ronald, then his possession was unlawful or wrongful from the time Michael received possession of the property, not when Ronald made a demand for the return of the money."

Holden and Izen dispute the district court's effort to distinguish *Clark Jewelers*, arguing that Michael's possession was not "unlawful" because he came "into innocent possession of" the misapplied royalty payments "by mistake." But this reasoning misses the mark. As noted above, Kansas law defines conversion as "the *unauthorized* assumption or exercise of the right of ownership over goods or personal chattels *belonging to another* to the *exclusion of the other's rights*." *Bomhoff*, 109 P.3d at 1246 (emphases added). To be liable for conversion, a defendant must intentionally exercise control over the property, which typically "requires an affirmative act on the part of the defendant, as distinguished from a mere omission to act or to perform a duty." Restatement (Second) of Torts § 224 cmt. a (Am. Law. Inst. 1965).

The demand-and-refusal requirement in *Clark Jewelers* makes sense in light of these principles. Because the defendant there was entitled to possess the bridal set on the date she received it, *see Clark Jewelers*, 662 P.2d at 1304, her affirmative act of taking possession on that date did not relate to property "belonging to another," and it was neither "unauthorized" nor "to the exclusion of [an]other's rights," *see Bomhoff*, 109 P.3d at 1246. Thus, because the *Clark Jewelers* defendant took the property with an affirmative right to possess it, she did not commit an act sufficient to constitute

48

conversion until the jewelry store demanded its return and she refused. *See* Restatement (Second) of Torts § 224 cmt. a ("[W]ithholding possession by an unqualified refusal to surrender [property] on demand is a sufficient act to constitute a conversion . . . ."); *id.* § 237 cmt. e (explaining that, in a conversion-by-demand-and-refusal situation, "[t]he conversion consists in the unlawful detention of the [property], and not in the manner in which possession was originally acquired"); *see also Goodbody & Co., Inc. v. McDowell,* 530 F.2d 1149, 1151 (5th Cir. 1976) ("[W]here the defendant's original possession is not wrongful, conversion is complete when the rightful owner demands the return of the property and is refused.").

Here, by contrast, Michael never had an affirmative right to possess the misdirected royalty payments. So, when Michael took the intentional, affirmative step of depositing them into his bank account, he engaged in "the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to [Ronald and Theresa] to the exclusion of [Ronald's and Theresa]'s rights." *See Bomhoff,* 109 P.3d at 1246. Thus, the tort of conversion was complete.

And because conversion is a strict liability tort under Kansas law, *Millennium Fin. Servs.,* 74 P.3d at 64; *accord First Nat'l Bank of Amarillo v. Sw. Livestock, Inc.,* 859 F.2d 847, 850 (10th Cir. 1988), it matters not that Michael's possession may have been the product of an innocent mistake. As long as an intentional act of control occurred, it is irrelevant for purposes of conversion that Michael did not know the royalties actually belonged to Ronald or Theresa. *See Nelson v. Hy-Grade Constr. & Materials, Inc.,* 527 P.2d 1059, 1062 (Kan. 1974) ("The intent required is simply to use or dispose of the

49

goods, and knowledge or ignorance of the actor as to their ownership has no influence in deciding the question of conversion."); Restatement (Second) of Torts § 223 cmt. b ("If the actor has the intent to do the act exercising dominion or control, . . . he is not relieved from liability by his mistaken belief that he had possession of the chattel or the right to possession, or that he is privileged to act."); 18 Am. Jur. 2d Conversion § 3 ("The act constituting 'conversion' must be an intentional act, but it does not require wrongful intent." (footnote omitted)).

We therefore agree with the district court that this is not a case where a demand was needed for a cause of action for conversion to accrue. Rather, the district court properly followed the general rule that, "[u]nder K.S.A. 60-513(b), a cause of action in tort for conversion . . . accrues when substantial injury first appears or when it becomes reasonably ascertainable." *Clark Jewelers*, 662 P.2d at 1304. And because Holden and Izen do not challenge the district court's finding that the conversion counterclaim was reasonably ascertainable more than two years before it was filed, we affirm the district court's conclusion that the counterclaim is barred by the statute of limitations and its ruling that Michael is therefore entitled to summary judgment on this issue.

## C. *Fraudulent Transfer*

Holden and Izen next challenge the district court's determination that Ronald's transfer of his interests to the Dirt Cheap Mine Trust was fraudulent with respect to Ronald's tax debt to the IRS. Specifically, they argue that (1) the district court should not have considered the United States' fraudulent-transfer argument because it was not included in the pretrial orders, and (2) even if the argument was properly entertained, the

50

district court erred in concluding the transfer was fraudulent.[23] Addressing each of these arguments separately, we affirm the district court's ruling on this issue.

### 1. The District Court's Decision to Address Fraudulent Transfer

Holden and Izen first argue that the district court should not have considered the fraudulent-transfer issue because the United States "failed to raise a claim for fraudulent transfer in the Pretrial Orders." In response, the United States concedes that its fraudulent-transfer argument was not explicitly included in any pretrial order but maintains the argument was simply a legal theory supporting its claim of first priority to royalty payments due on Ronald's mineral interest. As such, and because Holden and Ronald had sufficient notice of the argument and responded to it below, the United States maintains it was proper for the district court to consider whether the transfer here was fraudulent.

We review for abuse of discretion a trial court's decision to address or not to address an issue on the basis of a pretrial order. *See Grant v. Brandt*, 796 F.2d 351, 355 (10th Cir. 1986); *see also In re Rafter Seven Ranches L.P.*, 546 F.3d 1194, 1200, 1203–04 (10th Cir. 2008) (reviewing for abuse of discretion a bankruptcy court's decision to consider an issue not identified in the pretrial order or other pleadings). "Under the abuse of discretion standard, the decision of a trial court will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error

---

[23] Ronald and Holden conceded below that the IRS's first lien, for tax years 1997 through 2002, has first priority. The arguments here thus challenge only the district court's decision that the IRS's second lien, for tax years 2003 through 2005, also has priority over any interest the Trust might claim.

of judgment or exceeded the bounds of permissible choice in the circumstances." *In re Nat. Gas Royalties Qui Tam Litig.*, 845 F.3d 1010, 1017 (10th Cir. 2017) (internal quotation marks omitted). We find no abuse of discretion here.

Claims or theories that are not included in the pretrial order usually are waived. *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002). But it is also true that "a pretrial order should be liberally construed to cover any of the legal or factual theories that might be embraced by its language." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1220 (10th Cir. 2000) (internal quotation marks omitted). In particular, we have construed pretrial orders most liberally when the orders state the parties' claims in general terms. *See id.*; *Whalley v. Sakura*, 804 F.2d 580, 582–83 (10th Cir. 1986).

Here, the second revised pretrial order summarizes the United States' position in part as follows:

> The United States seeks an order determining the priority of its tax liens that arose from the tax assessments imposed against Ronald Leathers. It seeks a judgment ordering payment to the United States of those royalty sums currently being held by the co-defendant oil and gas operating companies but otherwise payable to Ronald Leathers (or his purported assignee the Dirt Cheap Mine Trust).

As the government points out, proving that Ronald's transfer to the Trust was fraudulent is one approach by which the government could establish its claim to a superior lien priority. *See In re Krause*, 637 F.3d 1160, 1163–64 (10th Cir. 2011). Thus, taking account of the pretrial order's generalized description of the United States' position as simply seeking a determination of the priority of its liens, and construing the pretrial order liberally, we think the government's fraudulent-transfer argument qualifies as a

52

"theor[y] that might be embraced by [the pretrial order's] language" and that is therefore covered by the order. *See Koch*, 203 F.3d at 1220 (internal quotation marks omitted).

Moreover, the district court's decision to resolve the fraudulent-transfer argument does not conflict with the underlying purpose served by requiring issues to be set forth in pretrial orders. "[T]he primary purpose of pretrial orders is to avoid surprise by requiring parties to 'fully and fairly disclose their views as to what the real issues of the trial will be.'" *Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (unpublished) (quoting *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276 (10th Cir. 2006)). Here, there was no surprise: Holden and Ronald received nearly two years' notice of the government's fraudulent-transfer theory, and they responded to it on several occasions.

At the latest, the United States first alleged its belief that the transfer was fraudulent in its December 2013 motion for summary judgment to foreclose its liens. Ronald and Holden addressed the validity of the assignment in their cross-motion for partial summary judgment and in their response to the government's motion. And in its February 2014 Order granting in part and denying in part summary judgment, the district court stated that "[t]he IRS cannot attach its lien to the trust's share of the royalties from the mineral interest *unless it establishes that Ronald fraudulently transferred his interest to the trust*." (Emphasis added.) Then, prior to what was initially scheduled as an October 2014 bench trial, both parties submitted additional briefing that addressed the issue, and the district court later noted that the validity of the assignment was one of the few issues that had been set for that scheduled trial. Although almost another full year passed before

53

the bench trial was actually held and the issue actually determined, the government had adequately and consistently asserted its position that the transfer was fraudulent in support of its claim to priority.

For all these reasons, we conclude that the district court did not abuse its discretion in choosing to decide the fraudulent-transfer issue. *See Rafter Seven Ranches*, 546 F.3d at 1203–04 (rejecting contention that lower court abused its discretion in deciding case on issue not identified in pretrial order because court's decision "was based on the general issues and principles articulated . . . in the pretrial order and the proceedings thereafter").

## 2. The District Court's Finding that the Transfer was Fraudulent

Holden and Izen next argue the district court's finding that the transfer to the Trust was fraudulent is clearly erroneous and should be reversed. Specifically, they claim that Ronald's assignment to the Trust is not voidable because Holden was a "good faith" transferee who gave "reasonably equivalent value" and that there was insufficient evidence that Holden harbored fraudulent intent. We are not persuaded.

We review "the district court's factual findings, made after a bench trial, for clear error; and its legal conclusions de novo." *Orient Mineral Co. v. Bank of China*, 506 F.3d 980, 1001 (10th Cir. 2007). "Whether a debtor transferred his property with intent to defraud creditors is a finding of fact." *In re Seay*, 215 B.R. 780, 788 (B.A.P. 10th Cir. 1997); *see also In re M & L Bus. Mach. Co.*, 84 F.3d 1330, 1338 (10th Cir. 1996) (concluding lower court's finding of good faith on the part of the transferee is primarily factual and should be reviewed for clear error). Findings of fact are only clearly

54

erroneous if "they are without factual support in the record or the appellate court, after reviewing the evidence, is firmly convinced that a mistake has been made." *Weston v. Harmatz*, 335 F.3d 1247, 1252 (10th Cir. 2003).

The IRS is authorized under 26 U.S.C. § 6321 to satisfy a tax deficiency by attaching liens to any "property" or "rights to property" belonging to the indebted taxpayer. State law determines what property rights a taxpayer has, and thus to what property rights a § 6321 lien attaches. *Krause*, 637 F.3d at 1163. "In Kansas, as in most states, a debtor cannot evade his creditors by fraudulently conveying his property to someone else." *Id.* at 1163–64. Such fraudulent conveyances "shall be deemed utterly void and of no effect." Kan. Stat. Ann. § 33-102. "Put differently, the transferor retains equitable ownership of the assets [fraudulently conveyed] and those assets remain subject to attachment by his creditors." *Krause*, 637 F.3d at 1164.

Kansas law and federal law are virtually identical with respect to identifying fraudulent transfers. Under Kansas law, a transfer made by a debtor is fraudulent as to a creditor if the debtor makes the transfer "[w]ith actual intent to hinder, delay or defraud" the creditor. Kan. Stat. Ann. § 33-204(a)(1); *accord* 28 U.S.C. § 3304(b)(1)(A). The statute includes in the next paragraph a non-exhaustive list of factors to consider in judging intent. *See* Kan. Stat. Ann. § 33-204(b); *accord* 28 U.S.C. § 3304(b)(2). In addition, both Kansas and federal law provide an exception whereby an otherwise voidable fraudulent transfer will not be voidable "against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee." Kan. Stat. Ann. § 33-208(a); *accord* 28 U.S.C. § 3307(a).

Here, the district court concluded that Ronald transferred his choses in action to the Trust with the actual intent to defraud the United States of his overdue tax bill. *See* 28 U.S.C. § 3304(b)(1)(A); Kan. Stat. Ann. § 33-204(a). The court therefore determined that the transfer was fraudulent and, in turn, void. This conclusion is supported by overwhelming evidence in the record, most notably direct testimony from both Ronald and Holden that the purpose of the Trust was to protect Ronald's mineral interests and associated royalty payments from the IRS.[24] Accordingly, the district court's finding that the transfer was fraudulent as to Ronald's tax debt was not clearly erroneous. *See Weston*, 335 F.3d at 1252.

Nor is there a material issue of fact regarding whether Holden qualifies as "a person who took in good faith and for a reasonably equivalent value" and who therefore could salvage the transfer. *See* Kan. Stat. Ann. § 33-208(a); *accord* 28 U.S.C. § 3307(a). Putting aside the fact that Holden did not raise this argument below, and even assuming that Holden provided "reasonably equivalent value," the record belies Holden and Izen's contention that Holden acted in "good faith," as the law requires. *See* 28 U.S.C. § 3307(a); Kan. Stat. Ann. § 33-208(a). We need look no further than Holden's deposition testimony, which reads in relevant part:

> The whole purpose of the trust was one thing, and that was to provide some kind of protection regarding the IRS for future payments, et cetera. It's very complex, as I'm sure you know, but once an assignment is done, then it changes IRS's reach, and that was the purpose. The purpose of the trust was

---

[24] Holden and Izen's argument that the government produced "insufficient evidence that Holden harbored a fraudulent intent" is irrelevant. Under Kansas and federal law, it is the intent of the *debtor*—here, Ronald—that matters. *See* 28 U.S.C. § 3304(b)(1)(A); Kan. Stat. Ann. § 33-204(a).

not to sue Mike Leathers. He [Ronald] could have done that directly with Joe [Izen]. That wasn't the purpose. The purpose was to afford some protection for any recovery that did occur for Mr. Ron Leathers and his three children.

Holden and Izen do not offer a good-faith explanation for this statement or any of the other evidence the district court relied upon in concluding the transfer was fraudulent with respect to Ronald's tax debt.

In short, the district court did not err, let alone clearly err, in finding Ronald's transfer to the Trust was fraudulent as to Ronald's debt to the IRS. We therefore agree with the district court that the IRS's tax lien for the years 2003 through 2005 takes priority over any interest the Trust might claim in minerals and royalties awarded to Ronald, and we affirm the grant of summary judgment to the United States on this issue.

### D. *Attorney Fees*

The remaining issues raised in Holden and Izen's appeal relate to Izen's request for attorney fees under 26 U.S.C. § 6323(b)(8). We review the district court's award of attorney fees for an abuse of discretion. *In re Nat. Gas Royalties Qui Tam Litig.*, 845 F.3d 1010, 1017 (10th Cir. 2017). "The abuse of discretion standard requires reviewing the district court's legal conclusions de novo and its factual findings for clear error." *Id.*

A federal tax lien normally has priority over later-filed competing liens under a "first in time, first in right" rule. *United States v. Wingfield*, 822 F.2d 1466, 1473 (10th Cir. 1987). However, Congress has provided in § 6323 of the Internal Revenue Code that certain types of liens will take priority over a tax lien even if they arise later. *See* 26 U.S.C. § 6323(b). As relevant here, § 6323(b)(8) states that a tax lien shall not be valid

"[w]ith respect to a judgment . . . , as against an attorney who, under local law, holds a

lien upon or a contract enforceable against such judgment . . . to the extent of his

reasonable compensation for obtaining such judgment." In other words, if an attorney

holds a lien or contract for fees that is valid under local law and enforceable against a

judgment obtained by the attorney, and the IRS also has a tax lien enforceable against

that judgment, the attorney's lien or contract takes priority over the tax lien to the extent

it covers reasonable compensation incurred in the process of obtaining the judgment. *See*

*Hussain v. Boston Old Colony Ins. Co.*, 311 F.3d 623, 643–44 (5th Cir. 2002); *Nebraska*

*v. Richter*, 764 F.2d 517, 518–19 (8th Cir. 1985).[25] Under Kansas law—i.e., the "local

law" applicable here—an attorney has a lien for compensation on money in his

possession belonging to his client and on money in the adverse party's possession

belonging to his client. *See* Kan. Stat. Ann. § 7-108. Attorney fees are otherwise

regulated in Kansas under Rule 1.5 of the Kansas Rules of Professional Conduct.

In the district court, Izen asserted he was entitled to a superpriority award of

attorney fees under § 6323(b)(8) on the basis of both a contingency fee contract and a

statutory lien under Kansas Statutes Annotated § 7-108. He argued that the contract

entitled him to 45 percent of "all amounts recovered in this case on which the United

States has asserted its tax liens," and alternatively, that he had a § 7-108 lien which

---

[25] The "purpose of [§ 6323(b)(8)] is to provide an incentive to attorneys to enhance the value of a taxpayer's property, which would ultimately increase the government's revenue collection." *Hussain v. Boston Old Colony Ins. Co.*, 311 F.3d 623, 643 (5th Cir. 2002); *see also Spencer v. Kirkpatrick*, 883 F. Supp. 588, 590 (W.D. Okla. 1995) ("[S]ection 6323(b)(8) only awards superpriority to the liens of those attorneys whose efforts have contributed to the judgment and in so doing, have helped create an asset from which the government can recover delinquent taxes.").

entitled him to his fees and costs—which he calculated as $127,662.50 and $36,515.66, respectively. But the district court saw things differently. The court concluded the contingency fee agreement was not enforceable against the judgment obtained in this case. And although the court agreed Izen was entitled to compensation under § 7-108 and granted him a superpriority lien under § 6323(b)(8), the court limited the award to a total of $39,689.88 for both fees and costs.

On appeal, Izen challenges both of these determinations. Addressing these challenges in turn, we conclude they both are meritless.

### 1. Contingency Fee Contract

Izen first argues the district court erred in declining to enforce his contingency fee agreement with the Dirt Cheap Mine Trust. He notes that the Trust assigned him a 45 percent interest in any chose in action used to recover Ronald's mineral interest and associated royalties, and he argues this assignment is legally enforceable and entitles him to collect as a fee 45 percent of the value of the minerals and royalties.

But Izen ignores the district court's conclusion that his fee agreement with the Trust is not enforceable against the judgment obtained for Ronald because Ronald was not a party to that agreement and Izen and Ronald did not enter into any similar agreement of their own. Izen argued below that he was entitled to fees under the contingency contract because Ronald had orally adopted that contract in his deposition testimony. But the district court rejected this argument because Kansas Rule of Professional Conduct 1.5 states that, in order to be valid, contingency fee agreements

59

must be in writing. *See* Kan. R. Prof'l Conduct 1.5(d). Izen does not challenge this determination on appeal, which is fatal to his claim.

Moreover, as the United States points out, Izen is not entitled to any fees under the terms of his contract because the contract granted him an interest in the *Trust's* recovery in this suit, which was zero. Accordingly, we affirm the district court's conclusion that the contingency agreement is not enforceable under § 6323(b)(8) against Ronald.

## 2.  The District Court's Fees & Costs Award

Izen next argues the district court "violated [§] 6323(b)(8) by refusing to grant all of the fees and costs requested in Izen's motion."

Although the district court determined that Ronald had no formal fee agreement with Izen, it concluded Ronald did authorize Izen to act as his attorney in this case and that Izen therefore was eligible to recover fees and costs under § 7-108 and § 6323(b)(8). But the district court concluded Izen was entitled to far less than the $164,178.16 in fees and costs that he had requested. The court determined that "[t]he vast majority of work cited by Mr. Izen was not undertaken to obtain a judgment for Ronald from which his tax obligation could be satisfied," and concluded that this work therefore was "not compensable under § 6323(b)(8)." *See Hussain*, 311 F.3d at 643–44 (explaining that courts have interpreted § 6323(b)(8) as providing a lien only for attorney fees generated in connection with securing money or other property that ultimately increases the taxpayer's taxable property and thus benefits the IRS). In the end, the court allowed 40 percent of Izen's claimed fees up until the May 2010 Order, and none of his claimed fees

60

after that time. The court also parred down much of Izen's claimed costs as unsupported, arriving at a total award of $39,689.88.

Izen's challenge to this award on appeal is essentially that the district court took too strict a view of what fees contributed to securing a judgment from which Ronald's tax obligations could be satisfied. He argues generally that the applicable standard should focus on which actions "reasonably contributed" to the judgment, rather than "led directly" to it. But the only specific example he gives of fees and costs recoverable under the proposed standard are the fees related to the Texas state-court action dismissed for lack of jurisdiction, and the "costs" associated with paying local counsel. These arguments fall well short of showing any abuse of discretion on the district court's part. *See Nat. Gas Royalties*, 845 F.3d at 1017.

First, the district court recognized correctly that § 6323(b)(8) provides superpriority for an attorney's lien only to the extent the lien covers compensation for efforts that helped obtain a judgment from which the government can satisfy a tax debt. *See* 26 U.S.C. § 6323(b)(8); *United States v. Ripa*, 323 F.3d 73, 80–83, 80 n.8 (2d Cir. 2003); *Hussain*, 311 F.3d at 643–44; *Richter*, 764 F.2d at 519. In applying this standard to the award requested by Izen, the district court offered a detailed, reasonable explanation of its decision to allow certain fees and to disallow others. Izen does not specifically challenge the district court's decision to exclude fees incurred after the May 2010 Order, which awarded 25 percent of the mineral rights, and associated royalties, to Ronald. As the district court noted, these fees, and "the vast majority of Mr. Izen's efforts," related to attempts "to <u>defeat</u> the claims of the IRS by asserting that the Dirt

61

Cheap Mine Trust owned the royalties and/or minerals, or that Ronald did not actually owe the taxes claimed by the IRS."

And while Izen does challenge the court's decision to exclude fees incurred in connection with the prior Texas state-court action that Izen filed on Ronald and Holden's behalf, his assertion that without the Texas action the present case "would never have been filed" is mere conjecture. Such speculation falls well short of demonstrating that the district court's decision to exclude those fees amounted to "a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Nat. Gas Royalties*, 845 F.3d at 1017 (internal quotation marks omitted). And Izen offers no argument to support his challenge to the exclusion of his "costs" for paying local counsel, which the district court concluded were "in reality . . . additional legal fees" that Izen had not justified as reasonable under § 6323(b)(8). We therefore find no abuse of discretion and affirm the district court's well-reasoned fee award.

## V. CONCLUSION

We reject the arguments raised by Ronald in Case No. 15-3264, and by Holden and Izen in Case No. 15-3280, and affirm the district court's judgment in all respects.